MIDLAND STATES LIFE INSURANCE COMPANY, Plaintiff-Appellant, v. ABLA HAMIDEH, Defendant-Appellee (Samy Hammad, Third-Party Intervenor-Appellee; The Department of the Lottery, Citation Respondent-Appellee).

First District (3rd Division)  No. 1—98—4617

Opinion filed December 29, 1999.—Rehearing denied January 27, 2000.

Hinshaw & Culbertson, of Chicago (Peter D. Sullivan and Christine L. Olson, of counsel), for appellant.

Ordower & Ordower, P.C., of Chicago (Lawrence B. Ordower, of counsel), for appellee Samy Hammad.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for appellee Illinois Department of Lottery.

JUSTICE WOLFSON delivered the opinion of the court:

The question in this case is whether an Illinois State Lottery winner can pledge as collateral for a loan her right to receive payments of her winnings. In this case of first impression, we hold she cannot. We agree with the trial court that her pledge of lottery payments was an invalid assignment pursuant to section 13 of the Illinois Lottery Law (20 ILCS 1605/13 (West 1996)).

## FACTS

On August 10, 1996, Abla Hamideh (Hamideh) entered into a loan agreement with Elantra Consulting Co. (Elantra). According to the promissory note, Hamideh received $102,800 in exchange for a promise to pay Elantra four installments of $44,850 ($179,400), with the first installment coming due on November 13, 1997. The note also provided that, on default, the entire principal and interest would be due.

Hamideh was a 1988 Illinois State Lottery winner entitled to receive annual payments of $44,850 each November until the year 2007. As collateral for the loan, Hamideh pledged her right to receive six lottery payments from the Illinois State Lottery. In accord with the loan agreement, Hamideh also sent a letter to the Illinois Department of the Lottery (the Department), directing it to deposit her future lottery installment payments, beginning in November 1997, into a Bank-First bank account in Knoxville, Tennessee, to which Elantra and its assigns had "sole right and power to withdraw funds." On August 13, 1996, Elantra recorded with the Illinois Secretary of State its Uniform Commercial Code (UCC) (810 ILCS 5/1—101 et seq. (West 1996)) financing statement showing the security agreement for the loan.

In September 1996, Elantra assigned its interest in the note and security agreement with Hamideh to Midland States Life Insurance Co. (Midland). Hamideh signed a power of attorney appointing Midland her attorney in connection with the BankFirst bank account, where her lottery winnings were to be sent.

In November 1997, Hamideh defaulted on the loan by failing to pay the first installment. Midland brought suit against Hamideh in the State of Colorado, County of Denver, to recover the entire amount of the note and interest. On March 5, 1998, a default judgment was entered by the Denver court against Hamideh in the amount of $187,019.24, plus 23.4% interest.

On March 19, 1998, Midland registered the Colorado default judgment in Illinois. On April 9, 1998, Midland filed a citation to discover assets with the Department and then, on June 22, 1998, filed a complaint against Hamideh in the circuit court of Cook County seeking turnover of Hamideh's annual lottery payments pursuant to the security agreement on the loan.

On July 22, 1998, the Department, as citation respondent, filed a response to the motion for turnover of Hamideh's lottery funds. The Department asked the court to deny the motion and dismiss the citation. The Department argued the security agreement was a voluntary assignment prohibited by section 13 of the Lottery Law (20 ILCS 1605/13 (West 1996)) and, therefore, invalid. Because the security agreement was invalid, the Department said, the default judgment did not date back to the original security interest. Consequently, the Department believed Midland's March 1998 default judgment lien did not take priority over two judgment liens, in the amounts of $177,506.23 and $234,330.30, which were placed on the lottery proceeds by orders of the circuit court of Cook County in two cases, Hammad v. Hamideh, No. 96 L 13454, and Hammad v. Hamideh, 96 CH 394, issued on December 18, 1996, and January 7, 1998, respectively.

Initially, the trial court ruled that pledging lottery winnings as security for a loan was not an illegal assignment under Illinois law. The court changed its position after rehearing, and on November 10, 1998, issued an order denying Midland's motion for turnover and dismissing the citation to discover assets against the Department. Midland appeals.

## DECISION

■ Section 13 of the Illinois Lottery Law (20 ILCS 1605/13 (West 1996)) states:

"No prize, nor any portion of a prize, nor any right of any person

to a prize awarded shall be assignable. \*\*\* Notwithstanding any other provision of this Section, any person *pursuant to an appropriate judicial order* may be paid the prize to which a winner is entitled, and all or part of any prize otherwise payable by State warrant under this Section shall be withheld upon certification to the State Comptroller from the Illinois Department of Public Aid as provided in Section 10—17.5 of The Illinois Public Aid Code. The Director shall be discharged of all further liability upon payment of a prize pursuant to this Section." (Emphasis added.)

The question for this court to resolve is whether pledging lottery payments as collateral for a loan is an invalid assignment pursuant to section 13 of the Lottery Law.

Midland contends Hamideh's pledge of certain future lottery installment payments as collateral for a loan did not constitute an assignment because Hamideh retained the power to repay the loan and Midland did not have an immediate and absolute right to Hamideh's lottery proceeds.

The Department, of course, does not agree. Failing to interpret the security agreement as an assignment, says the Department, would be an impermissible circumvention of the law and would render section 13 of the Lottery Law meaningless. The Department contends interpreting the security interest as something other than an illegal assignment would contravene the intent of the law.

No court in this state has addressed the particular issue presented here. We agree with the Department that Hamideh's pledge of her future lottery installments as collateral for the loan must be interpreted as an improper assignment pursuant to section 13 of the Lottery Law.

■ First, we consider whether this was a legitimate loan transaction. Our cynicism is sparked by the confluence of events in November of 1997—Hamideh's letter to the Department directing deposit of future payments into the Tennessee bank for Elantra's withdrawal takes effect, first installment on the note is due, first lottery payment from the Department assigned as collateral is due, and Hamideh defaults at the first opportunity.

We conclude Midland and Hamideh never intended the transaction to be a loan. It really was an arrangement where Hamideh would receive a lump sum of money in exchange for a promise to turn over her future lottery payments. Assignment of the lottery payments was an essential element of the scheme.

Though we believe the loan in this case was a sham, that is not the reason for our ruling. Even if the loan had been entirely straightforward, we would be bound to reach the same conclusion—

pledging future lottery winnings as security for a loan is impermissible pursuant to section 13 of the Illinois Lottery Law.

Section 13 has been interpreted by our Illinois courts on one prior occasion—*Walker v. Rogers*, 272 Ill. App. 3d 86, 650 N.E.2d 272 (1995). Walker was a lottery winner of $1,197,790. His winnings were to be paid in 20 annual installments of $59,889. He later attempted to assign his right to a $30,000 portion of each of 12 payments to R&P Capitol Resources, in exchange for a lump sum of $135,000. When the lottery refused to consent to the assignment agreement, R&P brought suit, seeking "an appropriate judicial order" pursuant to section 13 of the Lottery Law.

The trial court granted summary judgment to R&P, finding the law permitted the voluntary assignment of future payments of lottery winnings upon the entry of a judicial order.

The appellate court reversed. Whether a lottery winner could invoke the "pursuant to an appropriate court order" exception to the general prohibition against assignments by obtaining a court order sanctioning the assignment had never been decided by any Illinois court. After reviewing decisions in other jurisdictions, however, the reviewing court held the Illinois statute did not permit judicial approval of voluntary assignments of lottery winnings. Such an interpretation, said the court, would allow the exception to completely negate the rule—all one had to do to avoid the prohibition against assignment was obtain an agreed judicial order confirming the transaction.

The second clause of section 13, which provides "any person pursuant to an appropriate judicial order may be paid the prize to which a winner is entitled," did not mean the general prohibition against assignments could be overridden simply by obtaining the approval of the court. 20 ILCS 1605/13 (West 1996). Instead, adopting the reasoning set forth in cases from other jurisdictions having similar statutes (see *Converse v. Lottery Comm'n*, 56 Wash. App. 431, 783 P.2d 1116 (1989); *McCabe v. Director of New Jersey Lottery Comm'n*, 143 N.J. Super. 443, 363 A.2d 387 (1976); *In re Lotto Jackpot Prize of December 3, 1982 Won by Marinov*, 533 Pa. 402, 625 A.2d 637 (1993)), the *Walker* court concluded the term "pursuant to an appropriate judicial order" in the second clause of section 13 of the Lottery Law (20 ILCS 1605/13 (West 1996)) applied to:

> "judicial orders entered in separate proceedings where disposition of a lottery prize is an appropriate remedy, such as an order directing payment of prize winnings to a former spouse as part of an equitable distribution or spousal support in a marital dissolution case, for child support arrearage, or a garnishment order allowing a debtor to satisfy a judgment from a debtor-lottery winner." *Walker*, 272 Ill. App. 3d at 93.

We realize the circumstances of the present case are not identical to *Walker*. Still, we think the same conclusion must be reached. When a lottery winner pledges future installment payments as collateral for a loan, he receives a lump sum of money in exchange for an agreement to turn over future lottery installment payments. Although the agreement here is a contingent assignment of future lottery payments, all one must do to create the same situation that existed in *Walker* is default on the loan—just as Hamideh did at her first opportunity.

There may be instances where the lottery winner genuinely intends to enter into a loan transaction. But interpreting the pledge of future lottery winnings as collateral as anything other than a voluntary assignment within the meaning of the Illinois Lottery Law would create a situation where any lottery winner could circumvent the prohibition against assignment of future lottery payments. To determine the validity of the security agreement, courts would be placed in the position of having to make value judgments on the parties' intentions when entering into the loan.

■ We think a bright line should be drawn—any pledge of lottery winnings as collateral for a loan is an invalid voluntary assignment. We believe that is the meaning of the phrase "shall be assignable" in section 13. 20 ILCS 1605/13 (West 1996).

In reaching this decision we, like the court in *Walker*, have considered the decisions rendered by courts in other jurisdictions having similar statutes and policy considerations. For example, *McCabe v. Director of New Jersey Lottery Comm'n*, 143 N.J. Super. 443, 363 A.2d 387 (1976). McCabe sought a debt consolidation loan of $50,000. Collateral for the loan was McCabe's assignment of his right to receive future lottery winnings (totaling $60,000). McCabe then sought a court order recognizing his ability to assign his lottery winnings as collateral.

In deciding this novel issue, the New Jersey court first considered the plain language of the statute, which, reminiscent of our section 13, stated:

> "No right of any person to a prize drawn shall be assignable, *** except that any person pursuant to an appropriate judicial order may be paid the prize to which the winner is entitled." *McCabe*, 143 N.J. Super. at 445, 363 A.2d at 388.

Finding no legislative history which might furnish a clue to the intent behind this enactment, the court provided a brief historical overview of state-sanctioned lotteries and found them to be "a recent exception to the long-standing public policy in this State against gambling." *McCabe*, 143 N.J. Super. at 448, 363 A.2d at 389. The court then suggested three reasons why New Jersey, and other states, chose to pay top lottery winners in installments:

"1. The State had the use of the prize money without the obligation to pay interest for a considerable period of time.

2. The very substantial tax liability to the winner on large prizes is minimized.

3. The lottery winner, whether or not he needs the *Parens patriae* protection of the State, is legislatively insulated from his own human frailties and the possible excesses to which he would otherwise be subjected by suddenly coming into possession of an enormous amount of cash." *McCabe*, 143 N.J. Super. at 448, 363 A.2d at 390.

Allowing a lottery winner to obtain a lump sum of money, either by assignment to a finance company or otherwise, said the court, would "contravene the unexpressed but readily apparent intent of the law." *McCabe*, 143 N.J. Super. at 448, 363 A.2d at 390.

The same conclusion was reached in *Converse v. Lottery Comm'n*, 56 Wash. App. 431, 783 P.2d 1116 (1989). In *Converse*, the lottery winner (Converse) borrowed $350,000 to start up a business. The loan was secured by the physical assets of the business, as well as by Converse's right to receive annual lottery payments from 1989 to 1994. Converse and the loan institution then petitioned the court for an order approving the assignment of Converse's lottery installments. The trial court granted the petition, but the state lottery commission refused to honor it. Converse then sought judicial review of the commission's decision. The reviewing court determined the situation was nothing more than a request for a court-ordered sanction of a voluntary assignment of lottery winnings. This, the court found, did not fall within the exception to the state's general statutory prohibition against assignment of lottery winnings, *i.e.*, "pursuant to an appropriate judicial order."

The *Converse* court, citing *McCabe*, said the "obvious intent" of the legislature to "extend its *parens patriae* protection to lottery winners to insulate them from their own human frailties" was "clearly evidenced" by the legislature's decision to parcel out lottery winnings in installments. *Converse*, 56 Wash. App. at 436, 783 P.2d at 1119.

The court in *Converse* found another reason for disallowing assignments of lottery winnings—the burden that would be imposed on the Lottery Department due to the administrative expense involved in parceling out a winner's annual payment to various assignees.

We see no reason why the policy considerations for disallowing assignments proposed by courts in other jurisdictions should be rejected by this court.

We have searched the legislative history behind the passage of the Illinois Lottery Law and failed to find any clear statement of the

purpose behind the statutory prohibition against assignment of lottery winnings. Nevertheless, within the legislative debates, we note a general tenor of concern over the welfare of the people likely to participate in state-run lotteries, although no concern for the winners is expressed. We assume, as other courts have done, the installment payment structure, in conjunction with the general prohibition against assignment of lottery winnings, evidences the state's desire to exercise its *parens 'patriae* protection over lottery winners. While we may not see the need for such guardianship, it is not for this court to question the correctness of the legislature's rationale underlying the enactment.

Furthermore, the Senate debates revealed a concern that the cost of administering a lottery is excessively high in comparison to other methods of obtaining revenue. Allowing lottery winners to parcel out their annual payments to two or more assignees would add an additional financial burden on the state.

■Assuming the invalidity of the security agreement, as we now hold, a question remains—what recourse does Midland have for obtaining repayment of the loan pursuant to the promissory note?

This question was addressed in *Wolf v. Brach*, 241 A.D.2d 417, 660 N.Y.S.2d 430 (1997). In *Wolf*, a creditor sought a $170,000 portion of a lottery winner's $285,715 annual lottery payment pursuant to a security agreement. The agreement provided the creditor was to receive $170,000 each year until a $2,419,046.55 debt was paid.

New York State law provided:

"No right of any person to a prize shall be assignable *** except that any person, pursuant to an appropriate judicial order, may be paid the prize to which the winner is entitled." *Wolf*, 241 A.D.2d at 418, 660 N.Y.S.2d at 431.

The *Wolf* court held the "security agreement was void insofar as it pledges future installments on appellant's lottery prize." *Wolf*, 241 A.D.2d at 418, 660 N.Y.S.2d at 431. The court also said:

"While the proscription against assignment renders the pledged collateral defective, it does not operate to impair the validity of the note, which may be enforced against the appellant's assets. Lottery proceeds are an obligation of the State subject to attachment and are not exempt from application to the satisfaction of the judgment." *Wolf*, 241 A.D.2d at 418, 660 N.Y.S.2d at 431.

The void security agreement in this case cannot support a lien. Whether Midland's default judgment takes precedence over the other judgment liens placed on Hamideh's lottery winnings based on the valid promissory note is an issue that never was addressed by the lower court. We are not inclined to answer the question here.

## CONCLUSION

The order of the circuit court denying Midland's motion for turnover of lottery proceeds is affirmed. The cause is remanded for consideration of priority of judgments.

Affirmed and remanded.

CERDA and BURKE, JJ., concur.