In re Michelle L. DUBOFF, Debtor.

Singer Asset Finance Co., Plaintiff,

v.

Duboff Family Investments, David Duboff, Thomas E. Streder, Jr. Michelle L. Duboff, and National Bank of Dieterich, Defendants.

Bankruptcy No. 02–72335.
Adversary No. 02–7157.

United States Bankruptcy Court,
C.D. Illinois.

March 13, 2003.

Francis J. Giganti, Springfield, IL, for debtor.

Ronald L. Pallmann, Clayton, MO, for David Duboff.

Bernard G. Segatto, III, Springfield, IL, Brian P. Mack, Chicago, IL, for Singer Asset Finance Co.

Bruce A. Burkey, Altamont, IL, for National Bank of Dieterich.

Mark T. Dunn, Bloomington, IL, for trustee.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

The issue before the Court is whether the pledge of a stream of lottery payments as collateral for a loan violates Section 13 of the Illinois Lottery Law and is therefore void.

On April 19, 1997, the Debtor, Michelle Duboff, and her estranged husband, David Duboff, won $14 million in the Illinois State Lottery Lotto. The Duboffs created The Duboff Family Investment Partnership on July 18, 1997, for the specific purpose of receiving and managing the lottery prize proceeds. The Duboffs are the only partners of the partnership. The Lotto prize was to be paid in twenty annual installments of $700,000 ($483,000 after taxes); payments were due on April 19th of each year, commencing in 1997 and ending in 2016.

On November 15, 1999, the Partnership entered into a loan transaction with Merrick Bank Corporation. Pursuant to the loan, Merrick loaned $2,500,000 to the Partnership and to the Duboffs as co-borrowers. In return, the Partnership promised to repay the loan by making ten annual payments of $464,421 each, payable on May 22nd of each year, commencing in 2000 and ending in 2009.

Various documents were executed by the Duboffs to secure the payment of the Partnership obligation to Merrick. The Loan Agreement recites that the "Borrow-

er" is an Illinois State Lottery prize winner, and that the Borrower is seeking a loan to "be secured by all or a portion of Borrower's Lottery Prize as collateral for the loan...". Under the Loan Agreement, the Borrowers are required to file a change of address with the Illinois State Lottery "specifying that the collateral will be directed as specified by Lender or Processing Agent (which directive shall be irrevocable without Lender's or Processing Agent's prior written consent)." The Borrowers were also required to execute and deliver to the Lender durable powers of attorney "appointing Lender or Processing Agent as his attorney-in-fact to take such actions as specified" therein. The Loan Agreement also required the Borrowers to execute and maintain a last will and testament appointing the Processing Agent— Singer Asset Finance Company, L.L.C.— as a "limited Personal Representative of my estate" for the purpose of distributing the Borrower's interest at death in the Lottery Prize. The Loan Agreement also required the Borrower to make a specific bequest to the Processing Agent of the lottery prize to the extent that payment obligations remained under the Loan Agreement.

The Loan Agreement prohibited the Borrowers from doing "anything which would divert any Collateral payments from Lender". In the event the Borrowers received any payment by the State Lottery by mistake or as a result of any action or omission by the Borrower, they were required to turn the funds over to the Processing Agent within three business days.

The Loan Agreement contained a severability clause which provided that "[i]f any provision of this Agreement is held to be invalid or unenforceable, such invalidity and unenforceability shall not affect the validity or enforceability of any provision hereof, all of which provisions are hereby declared to be severable". Finally, the Loan Agreement selected the laws of Utah to cover the Agreement. However, the Agreement recognized "that the laws of the state of the State Lottery may require that the laws of the state of the Lottery apply to the grant by Borrower hereunder of a security interest in the Collateral and to the perfection of Lender's security interest therein".

On November 19, or 29, 1999—the document is not clear and the exact date is not important—Merrick assigned its interest in the Loan Agreement to Singer Asset Finance Company, L.L.C. Thus, Singer became entitled to the loan payments and security.

In 2000, the Partnership, through its partners, sought a lump sum payment of the lottery prize proceeds discounted to present value. On December 26, 2000, the Illinois Lottery Commission, through the Treasurer of the State of Illinois, issued a cashout check in the amount of $5,127,607.81. No part of this lump sum payment was forwarded to Singer.

The cashout of the lottery prize was a violation of the loan documents and constituted a default under the Loan Agreement. Because of the default, the loan was accelerated and became due and payable.

Singer filed suit in Sangamon County Circuit Court on January 19, 2001, seeking payment on the loan. The six-count complaint alleges breach of contract, unjust enrichment, constructive fraud, conversion, common law conspiracy, and a security interest under the Uniform Commercial Code. Named as defendants are the following:

1. Michelle Duboff, who filed a petition pursuant to Chapter 7 of the Bankruptcy Code on May 31, 2002;

2. David Duboff, the estranged husband of the Debtor;

3. The Duboff Family Investments Partnership, the entity formed by the Duboffs for the purpose of receiving the lottery payments;

4. Thomas Streder, Jr., the boyfriend and business partner of the Debtor who recently filed his own Chapter 11 petition in this Court, and

5. The First National Bank of Dieterich, which is named as a defendant because it is holding assets of the Debtor.

The Circuit Court action was subsequently removed to this Court. Prior to the removal of Singer's Circuit Court complaint, Mr. Duboff had filed a motion to dismiss Singer's pleading. Mr. Duboff has renewed this motion before this Court. Briefs have been filed by Mr. Duboff, Singer, and the Debtor's Chapter 7 trustee.

■ The initial issue before the Court is the choice of the applicable law. As noted above, the Loan Agreement provides that the law of the state of Utah is to be applied. While contractual stipulations as to the choice of law are generally honored, *In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir.1993), they may not be used to contravene public policy. *Nonotuck Silk Co. v. Adams Express Co.*, 256 Ill. 66, 99 N.E. 893 (1912). For example, Illinois courts have found choice of law provisions to be against public policy in cases involving gambling contracts. *Thomas v. First National Bank*, 213 Ill. 261, 72 N.E. 801 (1904); *Resorts International, Inc. v. Zonis*, 577 F.Supp. 876 (N.D.Ill.1984). In this case, the State of Illinois has a statute which specifically expresses the public policy of the State on the assignment of lottery prizes. 20 ILCS 1605/13. As recognized by one Illinois court, the purpose of Illinois' general prohibition against the assignment of lottery winnings "evidences the State's desire to exercise its *parens patriae* protection of lottery winners". *Midland States Life Ins. Co. v. Hamideh*, 311 Ill.App.3d 127, 134, 243 Ill.Dec. 723, 724 N.E.2d 32, 36 (1999). *See The Motley Fool*, 2002 WL 24368152 ("Most lottery winners can't handle their sudden wealth. A third of them end up bankrupt.") Given that this Loan Agreement was executed in Illinois, the Borrowers were Illinois residents, and the loan involves the assignment of Illinois State Lottery prize payments, the Court finds that the public policy of Illinois requires the application of Illinois law to the substantive issues in this case.

■ The next issue is whether the assignment of the lottery prize payments violates Illinois state lottery law and is thus void. Section 13 of the Illinois Lottery Law provides as follows:

No prize, nor any portion of a prize, nor any right of any person to a prize awarded shall be assignable. Any prize, or portion thereof remaining unpaid at the death of a prize winner, may be paid to the estate of such deceased prize winner, or to the trustee under a revocable living trust established by the deceased prize winner as settlor, provided that a copy of such a trust has been filed with the Department along with a notarized letter of direction from the settlor and no written notice of revocation has been received by the department prior to the settlor's death. Following such a settlor's death and prior to any payment to such a successor trustee, the Director shall obtain from the trustee and each trust beneficiary a written agreement to indemnify and hold the Department harmless with respect to any claims that may be asserted against the Department arising from payment to or through the trust. Notwithstanding any other provision of this Section, any person pursuant to an appropriate judicial order may be

paid the prize to which a winner is entitled and all or part of any prize otherwise payable by State warrant under this Section shall be withheld upon certification to the State Comptroller from the Illinois Department of Public Aid as provided in Section 10–17.5 of The Illinois Public Aid Code. The Director [of the Lottery] shall be discharged of all further liability upon payment of the prize pursuant to this Section.

20 ILCS 605/12.

Two Illinois courts have interpreted Section 13, and both have squarely held that a pledge of lottery payments is an invalid assignment pursuant to Section 13. *Walker v. Rogers,* 272 Ill.App.3d 86, 208 Ill.Dec. 815, 650 N.E.2d 272 (1995); *Midland States Life Ins. Co. v. Hamideh, supra.* Courts across the country interpreting similar anti-assignment provisions have reached the same conclusion. *In re Koonce,* 262 B.R. 850 (Bankr.D.Nev.2001) (Assignment of lottery prize violates Massachusetts state lottery law and is thus void); *Petition of Singer Asset Finance Company, L.L.C.,* 314 N.J.Super. 116, 714 A.2d 322 (1998); (Court order sanctioning an assignment of lottery winnings is limited to circumstances of necessity); *In re Meyers,* 139 B.R. 858 (Bankr.N.D.Ohio 1992) (Assignment of lottery prize void under Ohio law prohibiting assignment absent court order); *McCabe v. Director of New Jersey Lottery Commission,* 143 N.J.Super. 443, 363 A.2d 387 (1976) (Allowing lottery winner to obtain a lump sum of money by assignment would contravene intent of state anti-assignment law); *Converse v. Lottery Commission,* 56 Wash. App. 431, 783 P.2d 1116 (1989); *Lotto Jackpot Prize of December 3, 1982 Won by Marianov,* 533 Pa. 402, 625 A.2d 637 (1993); *In re Louisiana Lottery Corp. Grand Prize Drawing of March 21, 1992,* 643 So.2d 843 (1994). *See Singer Asset Finance Co., L.L.C. v. Bachus,* 741

N.Y.S.2d 618, 294 A.D.2d 818 (2002) (Assignment of structured settlement violated non-assignment clause; therefore no security interest was created in payments).

Singer argues that the Loan Agreement is a valid loan, not a prohibited assignment. The *Hamideh* court specifically rejected any such distinction:

> There may be instances where the lottery winner genuinely intends to enter into a loan transaction. But interpreting the pledge of future lottery winnings as collateral as anything other than a voluntary assignment within the meaning of the Illinois Lottery Law would create a situation where any lottery winner could circumvent the prohibition against assignment of future lottery payments. To determine the validity of the security agreement, courts would be placed in the position of having to make value judgment on the parties' intentions when entering into the loan
>
> We think a bright line should be drawn—any pledge of lottery winnings as collateral for a loan is an invalid voluntary assignment. We believe that is the meaning of the phrase "shall be assignable" in Section 13.

311 Ill.App.3d at 132, 724 N.E.2d at 36.

Singer also argues that it has a valid security interest in the lottery proceeds because the Illinois Commercial Code provides that an "account" includes "winnings, in a lottery . . . sponsored by a state, governmental unit of state . . ." 810 ILCS 5/9–102(a)(2). This provision, however, did not become effective until July 1, 2001, nineteen months after the Loan Agreement was executed. Therefore, § 9–102(a)(2) of the Illinois Commercial Code is not applicable to the facts in this case. In any event, § 9–102(a)(2) does not necessarily conflict with Section 13 of the Illinois Lot-

tery Law. While the winnings of Illinois State Lottery winners are clearly nonassignable under Section 13, the Illinois Commercial Code provides for the possibility of a security interest in lottery winnings from another state that does not restrict the assignability of winnings from its lottery.

Based on the foregoing, the court finds that Singer does not have a valid security interest in the lottery payments. The next issue is what effect does the invalidity of the security provision have on the rest of the Loan Agreement. Mr. Duboff argues that the entire transaction is void and unenforceable. The Illinois Appellate Court specifically rejected this argument in *Hamideh*:

> While the proscription against assignment renders the pledged collateral defective, it does not operate to impair the validity of the note, which may be enforced against the appellant's assets.

311 Ill.App.3d at 134, 724 N.E.2d at 37, *quoting Wolf v. Brach*, 660 N.Y.S.2d 430, 241 A.D.2d 417, 418 (1997). *See In re Koonce, supra*, 262 B.R. at 862 (Creditor has status as unsecured creditor after its lien on lottery payments found to be invalid).

The Court's conclusion is buttressed by the severability clause in the Loan Agreement. Under Illinois law, a trial court has the power to modify a contract so that it comports with the law or to sever the unenforceable provisions from a contract. *O'Brien v. Encotech Const. Services, Inc.*, 203 F.R.D. 346, 349 (N.D.Ill.2001), *on reconsideration*, 183 F.Supp.2d 1047 (2002). The Court agrees with Singer that the inclusion of the severability clause in the Loan Agreement indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions.

So far, the Court has found that Singer's security interest in the lottery prize payments is invalid and unenforceable, but that Singer has an unsecured claim against the Duboffs and their partnership. The Court will now apply this holding to the six counts of Singer's complaint.

Count I alleges that the Duboffs and their partnership violated several provisions of the Loan Agreement when they cashed out their lottery prize and failed to remit the proceeds to Singer. Because the Court has refused to void the entire agreement, this Court denies the motion to dismiss.

Count II alleges unjust enrichment in that the Debtor and Mr. Streder deliberately and unilaterally changed the terms of the Loan Agreement by cashing out the lottery prize and paying off consumer loans held by the Debtor and Mr. Streder. The complaint specifically alleges that Mr. Streder used money from funds received from the lottery to issue a money order from an account held jointly in his name and that of the Debtor to Mr. Duboff in the amount of $1,150,000. Mr. Duboff asserts that he did not receive any of the funds from the cash out of the lottery prize. Mr. Duboff raises an issue of fact which the Court will have to determine at trial; it is not grounds to support a motion to dismiss.

Count III alleges that the Defendants—the Partnership, the Debtor, Mr. Streder, and Mr. Duboff—defrauded Singer by redirecting monies owed to Singer. Singer alleges that the Duboffs and their Partnership had an agency relationship with Singer and that they falsely represented that they would remit payments from the Lottery within three days of payment received. Singer alleges that it relied to its detriment on this false representation of the Defendants. Singer has

stated a claim for fraud. Therefore, the motion to dismiss Count III is denied.

Count IV alleges that the Defendants converted Singer's collateral—the stream of lottery payments—for their own use. Because the Court has determined that Singer did not have a valid security interest in the lottery prize, Mr. Duboff's motion to dismiss this count is allowed.

 Count V alleges that the Debtor and Mr. Duboff, as general partners of the Partnership and in their own individual capacities, agreed amongst themselves to request the cash buyout, change the address of the lottery payment to the Debtor's residence, and split the cash payout. Singer alleges that this constitutes a conspiracy "to deprive Singer of its money and of its rights under the Loan Agreement, Security Agreement and affidavits." Under Illinois law, an actionable civil conspiracy consists of two or more persons intentionally combining for the agreed purpose of accomplishing by concerted action either an unlawful purpose or lawful purpose by unlawful means. *Veazey v. La-Salle Telecommunications, Inc.*, 334 Ill. App.3d 926, 932, 268 Ill.Dec. 750, 779 N.E.2d 364, 370 (2002). The alleged unlawful purpose in this case is the circumvention of Singer's security interest in the lottery payments. However, the Court has determined Singer's security interest to be invalid. Therefore, there is no unlawful act to support the civil conspiracy claim. Accordingly, Count V must be dismissed.

Count VI is premised on Singer's perfected security interest in the lottery payments under the Illinois Commercial Code. Because the Court has voided this security interest, Count VI must be dismissed.

For the foregoing reasons, Mr. Duboff's motion to dismiss is denied as to Count I, II, and III, and allowed as to Counts IV, V, and VI.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.