MIDLAND STATES LIFE INSURANCE CO. *vs.* JOSEPH P.
CARDILLO & another[1] (and a companion case[2]).

Nos. 00-P-709 & 01-P-1830.

Suffolk. Norfolk. October 11, 2002. - October 9, 2003.

Present: PERRETTA, BECK, & RAPOZA, JJ.

*Lottery. Assignment. Statute,* Construction. *Governmental Immunity.
Administrative Law,* Agency's interpretation of regulation.

Discussion of the applicability of the doctrine of sovereign immunity in civil
   actions against the Massachusetts Lottery Commission brought by a party
   to whom two lottery winners had pledged a certain portion of their future
   annual prize distributions in exchange for a lump sum. [536-537]
A Superior Court judge properly dismissed claims against the defendants, a
   lottery winner and the Massachusetts Lottery Commission ("Lottery"),
   that were brought after the Lottery refused to transfer to the plaintiff the
   winnings of the individual defendant and another, who had defaulted on
   the terms of their lump sum loan agreements with the plaintiff, pursuant to
   which they pledged a certain portion of their future annual prize money
   distributions as collateral, where G. L. c. 10, § 28, and 961 Code Mass.
   Regs. § 2.28 prohibit the voluntary assignment of lottery proceeds so as to
   save the Lottery from the administrative burden and expense of parceling
   out a winner's annual payments to various assignees [537-540], and where
   amendments to the Uniform Commercial Code left intact the Lottery's
   proscription of such assignments [540-541].
A claim for declaratory judgment was properly dismissed where the plaintiff
   sought an order for the payment of money rather than a declaration. [540]

CIVIL ACTION commenced in the Superior Court Department on
July 12, 1999.

A motion for default judgment was heard by *Charles T. Spur-
lock,* J.; motions for judgment on the pleadings and to redirect
the payment of proceeds were heard by *Thomas E. Connolly,* J.;

---

[1]Massachusetts State Lottery Commission.

[2]Midland States Life Insurance Co. *vs.* Massachusetts State Lottery
Commission.

and entry of separate and final judgment was ordered by *Peter M. Lauriat*, J.

CIVIL ACTION commenced in the Superior Court Department on July 10, 2000.

A motion to dismiss was heard by *Elizabeth M. Fahey*, J.

*Peter C. Kober, Frederick L. Trilling & Herbert Lemelman* for the plaintiff.

*Rosemary Connolly*, Assistant Attorney General, for the Massachusetts State Lottery Commission.

BECK, J. In 1997, two unrelated previous winners of the Massachusetts Lottery Commission's "Megabucks" game obtained lump sum payments from two Colorado corporations. In exchange, the winners pledged to the corporations a certain portion of their future annual prize money distributions. The plaintiff, Midland States Life Insurance Co. (Midland), is the present holder of the "promissory note[s]" reflecting these transactions. Both of the winners defaulted on the terms of the lump sum agreements not long after receiving the money. When the Lottery Commission (Lottery) refused Midland's request to transfer the winners' payments to Midland, Midland initiated actions against the Lottery in Superior Court seeking the money. Midland now appeals from judgments dismissing its complaints.

1. *Factual and procedural background.* Although the cases were not formally consolidated, the panel heard them together at oral argument. We refer to the cases by the names of the lottery winners, despite the fact that one of them is not a party to the appeal in his case. For convenience we use words such as "loan," "lender," "promissory note," and "security agreement" as set out in the documents, even though it is the legal significance of these documents that is at issue. The complicated but undisputed factual and procedural backgrounds are as follows.

a. *The Cardillo case, 00-P-709.* On March 6, 1991, Joseph P. Cardillo, of Utica, New York, won a Massachusetts Megabucks prize of $766,520, to be paid in twenty equal installments. Six years later, he signed a so-called loan agreement with Sparcons, Inc., a Colorado corporation, for $104,100. In exchange he pledged to Sparcons the majority of his remaining annual lot-

tery payments. Shortly thereafter, Sparcons endorsed the note and assigned it to Midland.

The documents in the record include a "loan agreement," "a security agreement," and "a promissory note." (There is also mention of a Uniform Commercial Code filing but it does not appear in the record.) The loan agreement and the security agreement are in conflict with the promissory note as to the amount to be paid to Midland annually as well as the number of payments involved. We do not dwell on this point. It is the legal significance of the agreement with which we are concerned.

The "collateral" set out in the security agreement included "all of Debtor's right, title and interest to . . . twelve [annual] lottery payments." Covenants to the loan agreement required Cardillo to write to the Lottery requesting that the lottery payments be made to a bank account in his name, "provided that Lender or its assignee shall have the sole right and power to withdraw funds from such account and borrower shall have no right or power to withdraw funds from such account." Cardillo was obligated to execute whatever documents were necessary to redirect loan payments to the lender. Apparently he did not do so. There was also a covenant of confidentiality prohibiting Cardillo from disclosing the terms of the agreement, with a penalty of $250,000 should he violate the covenant.

By the time the second loan payment was due, Cardillo had defaulted. Midland sued on the note in Colorado, as the agreement specified, and obtained a default judgment against Cardillo in the amount of $211,633.91. That figure included $103,288.42 (the unpaid balance on the loan), plus $56.77 per day in interest on the unpaid principal (an interest rate of 20.06 percent), attorney's fees of $560, and costs of $189. Midland also brought suit against Cardillo and the Lottery in Massachusetts, seeking to reach and apply Cardillo's promised annual prize payments to satisfy the Colorado judgment. Midland also sought injunctive relief.

The Lottery filed a motion for judgment on the pleadings, see Mass.R.Civ.P. 12(c), 365 Mass. 756 (1974), asserting that, under the doctrine of sovereign immunity, the Superior Court did not have jurisdiction over the Commonwealth in a reach and apply action. The Lottery contended that Midland should proceed

against Cardillo directly. Midland then filed a motion for an order redirecting payment of lottery proceeds to it. A month later, a judge of the Superior Court allowed Midland's motion for default judgment against Cardillo. Another judge allowed the Lottery's motion for judgment on the pleadings against Midland. The second judge also denied Midland's motion to redirect the lottery proceeds. Subsequently a third Superior Court judge ordered that judgment in favor of the Lottery be entered on the docket.

b. *The Celestin case, 01-P-1830.* In May, 1992, Emmanuel C. Celestin, apparently of Miramar, Florida, won a Megabucks drawing of $920,320, payable in twenty annual payments of $46,016, less amounts withheld for State and Federal taxes. Five years later, he borrowed $100,000 from Feta Corp., a Colorado corporation with a different name but identical address as Sparcons, the company that lent a similar amount to Cardillo at about the same time. The Celestin note was payable in seven annual installments of $30,000.

The loan covenants required that Celestin establish a customer checking account in a named Colorado bank and execute a limited power of attorney vesting authority in Feta to deposit the annual lottery installments in the account with "the sole and exclusive authority" to withdraw funds from the borrower's account. A so-called security agreement defined the collateral as the lottery payments due and "[a]ll proceeds" in a bank account maintained by Celestin in the Colorado bank. The loan agreement also required Celestin to allow the lender to obtain a court order confirming the terms of the agreement. As with Cardillo, it appears that Celestin did not carry out his part of the bargain. It, too, included a covenant of confidentiality with presumed damages of $250,000 for any breach thereof.

A year after signing the first agreement, Celestin borrowed another $34,000 from Feta. The second loan was payable in four additional annual installments of $30,000. Feta assigned both loans to Midland. Celestin's second loan was similar to the first except that the terms were more onerous. Again there appear to be discrepancies between the note and the security agreement.

When Celestin defaulted in 1999, Midland held an auction of

Celestin's interest in the lottery payments still pending. The sole bid for $135,000 was that of Midland. Midland then notified the Lottery of the auction and requested that the Lottery make Celestin's lottery payments to Midland. The Lottery refused on grounds that Celestin had "no legal right to assign the proceeds or grant a security interest in the proceeds," citing G. L. c. 10, § 28, and 961 Code Mass. Regs. § 2.28. Midland then filed a second action against the Lottery. The first count sought a detailed declaration that Midland had an enforceable security interest in Celestin's lottery winnings, the second count sought injunctive relief, and the third sought money damages from the Lottery. The Lottery filed a motion to dismiss Midland's complaint pursuant to Mass.R.Civ.P. 12(b)(1) and 12(b)(6), 365 Mass. 755 (1974). A Superior Court judge allowed the motion. (Only the appeal from count one is before us.)

2. *Discussion.* a. *The* Singer Friedlander *decision.* Before either of the present actions had been filed, the Supreme Judicial Court, interpreting G. L. c. 10, § 28, had already held that the voluntary assignment of lottery proceeds is prohibited. *Singer Friedlander Corp.* v. *State Lottery Commn.*, 423 Mass. 562 (1996). As did the judges who allowed the Lottery's motions to dismiss, we agree with the Lottery that the cases before us are attempts to circumvent § 28 and the rule of *Singer Friedlander.*

As relevant here, G. L. c. 10, § 28, as amended through St. 1993, c. 460, § 1, provides:

> "No right of any person to a prize shall be assignable, except that . . . any person pursuant to an appropriate judicial order may be paid the prize to which the winner is entitled . . . . Neither the [Lottery] nor the director shall be liable for the payment of a prize pursuant to this section."

In *Singer Friedlander, supra,* the lottery prize winners, having gotten over their heads financially by cosigning several notes for friends, sought to trade their right to two of their payments for an immediate lump sum loan "[t]o prevent foreclosure [on their house] and to stabilize [their] finances." 423 Mass. at 563. The loan was conditioned on their obtaining judicial approval of the assignment. (It appears that Singer Friedlander

was another "corporation . . . offer[ing] discounted lump sum payments in exchange for assignments of future prize payments from State lottery winners." *Ibid.*) After a thorough analysis, the court concluded that, if the judiciary were able to approve voluntary assignments through declaratory judgment actions, particularly given the lack of guidance in the statute for deciding what circumstances would warrant such a judicial order, the exception would swallow the rule. *Id.* at 565-566. The court further noted that its decision comported with "nearly every reported appellate and trial decision which has construed State lottery statutes containing similar language." *Id.* at 566, citing cases. See, e.g., *Midland States Life Ins. Co.* v. *Hamideh*, 311 Ill. App. 3d 127, 128 (1999), holding that an Illinois State Lottery winner could not pledge as collateral for a loan her right to receive payments of her winnings.

b. *Standard of review.* The motion judge dismissed Midland's complaint in the Cardillo case by endorsement on the Lottery's motion for judgment on the pleadings pursuant to Mass.R.Civ.P. 12(c). The judge cited the lottery statute, *Singer Friedlander*, and a Superior Court case. In the Celestin case, the judge dismissed the complaint in a memorandum of decision for failure to state a claim pursuant to Mass.R.Civ.P. 12(b)(6). She relied on the doctrine of sovereign immunity. She also held that the security agreement contracts were not enforceable. We review to determine whether the Lottery carried its burden of showing that there was no set of facts that would entitle Midland to the relief it sought. See *Nader* v. *Citron*, 372 Mass. 96, 97-98 (1977). (We take the many attachments and exhibits in the record to be part of the pleadings.)

c. *Sovereign immunity.* The Lottery's first defense to Midland's action rested on sovereign immunity. It has long been established that "the Commonwealth cannot be impleaded in its own courts except by its own consent, clearly manifested by act of the Legislature," *Nash* v. *Commonwealth*, 174 Mass. 335, 338 (1899), or by "necessary implication" from such action. *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981). "The rules of construction governing statutory waivers of sovereign immunity are stringent." *Ibid.* "[T]he Commonwealth cannot be impleaded as a party defendant in a suit

to reach and apply property in its possession, which is due and payable to the principal defendant." *Massachusetts Elec. Co.* v. *Athol One, Inc.,* 391 Mass. 685, 688 (1984), citing *William J. McCarthy Co.* v. *Rendle,* 222 Mass. 405, 406 (1916).

In this case, however, we think the sovereign immunity argument begs the question. Surely the winner retains the right to sue the Lottery for improper action with regard to the winner, with whom there is a direct contractual relationship. See *First Natl. Ins. Co. of Am.* v. *Commonwealth,* 376 Mass. 248, 250 (1978) (waiver of immunity granted by G. L. c. 258, § 1, interpreted as applying primarily to contracts). The question is whether Midland permissibly may stand in the shoes of the winner to collect the winner's lottery prize money. To answer this question, we examine the statutory and regulatory framework governing the Lottery.

d. *Statutory and regulatory proscription of assignments.* In refusing Midland's request to send the winners' prize money to Midland, the Lottery cited G. L. c. 10, § 28, and 961 Code Mass. Regs. § 2.28. We now turn our attention to the detailed regulations the Lottery promulgated pursuant to G. L. c. 10, § 24, and c. 30A to define and regulate the operation and administration of the Lottery. 961 Code Mass. Regs. §§ 2.01 & 2.02 (1996).

"[W]e . . . [give] agencies broad discretion to interpret statutes that they enforce, lending 'substantial deference' to their interpretations." *City Council of Agawam* v. *Energy Facilities Siting Bd.,* 437 Mass. 821, 828 (2002). "So long as the agency's interpretation of its regulations and statutory mandate is rational, and adhered to consistently, it should be respected." *Boston Police Superior Officers Fedn.* v. *Boston,* 414 Mass. 458, 462 (1993). "This deference has included approving agency regulations that, while technically enlarging the meaning of a statute, are consistent with its intent." *City Council of Agawam* v. *Energy Facilities Siting Bd., supra.*

As the Lottery points out, in precluding the assignment of prize money, the Lottery is committed to dealing with a single person as the winner. In addition to the statute prohibiting the assignment of the right to receive Lottery winnings, which we have already discussed, the regulations make this even more

clear. "The [Lottery] need only recognize as the true owner of a winning lottery ticket the person whose signature appears upon the ticket in the area designated for said purpose. . . . [It] shall make payment in complete reliance of the information submitted to it on the claim form and winning ticket." 961 Code Mass. Regs. § 2.39 (1993). Any public employee or official connected in any way with the Lottery "shall be discharged of all liability upon payment of a prize or any one installment thereof to the holder of any winning lottery ticket or in accordance with the information set forth on the claim form supplied by the [Lottery]. . . . Payment pursuant to 961 CMR § 2.45 shall discharge the [Lottery] . . . of further liability or responsibility to any and all claimants." 961 Code Mass. Regs. § 2.45 (1996).

We think the sum of these regulations is that the legislative intent was to protect the Lottery from administrative hassles such as those at issue here. The regulations make clear that, once a winner has been determined, and the Lottery has begun payments pursuant to the regulations, it has no further responsibility to answer for what a lottery winner later does with his prize. Otherwise the Lottery could not rely on the determination of the winner to discharge its obligations. There could be endless administrative expense and risk of potential liability if the Lottery were required to reexamine the status of the prize winners on a regular basis. Given this legislative intent, the Lottery's argument that the arrangements to which Cardillo and Celestin agreed were in effect impermissible assignments is persuasive. Other jurisdictions facing similar issues have come to similar conclusions.

For example, in *Midland States Life Ins. Co.* v. *Hamideh*, the Illinois Appellate Court came to the same conclusion in a case with which Midland must have been familiar. The *Hamideh* case is similar to our cases in critical respects. First, there are the factual similarities: a lottery winner who pledged her right to receive six lottery payments totaling $269,100, in exchange for a lump sum payment of $102,800; an early default; and an action against the Illinois Lottery Department (Department). Second is the relevant statute, which runs parallel to that of the Commonwealth in several respects:

"No prize, nor any portion of a prize, nor any right of any person to a prize awarded shall be assignable. . . . Notwithstanding any other provision of the Section, any person pursuant to an appropriate judicial order may be paid the prize to which a winner is entitled, and all or part of any prize otherwise payable by State warrant under this Section shall be withheld upon certification to the State Comptroller . . . . The Director shall be discharged of all further liability upon payment of a prize pursuant to this Section."

311 Ill. App. 3d at 129-130, quoting from 20 ILCS 1605/13 (West 1996). Third are the legal arguments.

Midland argued in *Hamideh*, as here, that the pledge of future prize money was not an assignment "because Hamideh retained the power to repay the loan and Midland did not have an immediate and absolute right to Hamideh's lottery proceeds." *Id.* at 130. The Department contended that "interpreting the security interest as something other than an illegal assignment would contravene the intent of the law." It argued, as does the Lottery here, that Hamideh's transaction was a voluntary assignment. *Ibid.*

There is long-standing support for this conclusion. See *O'Connell* v. *Worcester*, 225 Mass. 159, 161-162 (1916) ("An order given as security for a present indebtedness operates as an assignment . . . [but] [a]n assignment is not the less an assignment of a present indebtedness even if it is qualified by some condition, contingency or limitation depending upon the happening of a future event"); *Heffernan* v. *Wollaston Credit Union*, 30 Mass. App. Ct. 171, 179 (1991) (The right to grant a security interest falls within the "ordinary and reasonable meaning of the authority to assign or transfer"). See also Black's Law Dictionary, at 115 (7th ed. 1999), which notes the word assignment "is variously applied in law," quoting from Burrill, A Treatise on the Law and Practice of Voluntary Assignments for the Benefit of Creditors § 1, at 1 (Webb ed. 1894). Among the multiple dictionary definitions of assignment in Black's Law Dictionary, *supra*, is one for "collateral assignment," which is defined as "[a]n assignment of property as collateral security for a loan," precisely what Midland claims is at issue here.

The *Hamideh* court ruled that "[a]ssignment of the lottery payments was an essential element of the scheme." *Hamideh, supra* at 130. Even if the "loan" were entirely straightforward (which the court doubted), the use of lottery winnings as security for the loan would still have been impermissible under the Illinois law. The court concluded that "interpreting the pledge of future lottery winnings as collateral as anything other than a voluntary assignment within the meaning of the Illinois Lottery Law would create a situation where any lottery winner could circumvent the prohibition against assignment of future lottery payments. To determine the validity of the security agreement, courts would be placed in the position of having to make value judgments on the parties' intentions when entering into the loan." *Id.* at 132. The Illinois court elected to draw a bright line rule to carry out the meaning of the phrase: "No prize, nor any portion of a prize, nor any right of any person to a prize awarded shall be assignable." See *ibid.* As in our cases, such a rule does not impair the validity of a promissory note, which may be enforced against the lottery winner's assets, but saves the Lottery from the administrative burden and expense of parceling out the winner's annual payments to various assignees.

e. *Declaratory judgment.* By seeking a declaratory judgment in the Celestin case, Midland attempts to obtain an "appropriate judicial order," as allowed by G. L. c. 10, § 28, in order to avoid the statute's proscription of an assignment. However, as the Lottery points out, there is nothing Midland seeks to declare here, other than its right to the lottery payments.

f. *Amendments to the Uniform Commercial Code.* In July, 2001, art. nine of the Uniform Commercial Code (UCC) was amended to include lottery proceeds in the definition of "accounts" that could be subject to a security interest. See G. L. c. 106, § 9-102 (*a*)(2)(viii), as inserted by St. 2001, c. 26, § 39. Midland argues that this amendment demonstrates that the Legislature intended to remove lottery proceeds pledged as security from the lottery statute's prohibition against assignments. However, this theory is belied by the fact that the 2001 UCC legislation also explicitly addressed the subject of assignments.

While the amendments rendered statutory restrictions on as-

signments generally ineffective, see G. L. c. 106, § 9-405(*f*), the UCC legislation also included an amendment to the Commonwealth's lottery statute, G. L. c. 10, § 28, providing that the lottery statute prevails over G. L. c. 106, § 9-405, thus leaving intact the Lottery's proscription of assignments. See St. 2001, c. 26, § 1.

The net result of the 2001 UCC amendments is that, while the role of lottery proceeds in commerce is now explicitly recognized in art. nine, the Legislature has excepted the Massachusetts lottery from these changes. Therefore we conclude that the 2001 amendments have no impact on the issues before us in these cases.

3. *Conclusion.* We establish a bright line rule, as did Illinois, making clear that the lottery statute and regulations preclude the assignment of lottery proceeds as set forth in this opinion. The judgments below are affirmed.

*So ordered.*