**In re Enrique M. FRADEN, Sr., Debtor.**

**No. 02–41498–HJB.**

United States Bankruptcy Court, D. Massachusetts.

Nov. 8, 2004.

Michael J. Early, Haverhill, MA, Richard D. Gaudreau, for Debtor.

M. Ellen Carpenter, Roach & Carpenter, P.C., Boston, MA, for Windsor Thomas Group.

David M. Nickless, Nora K. McLaughlin, Nickless & Phillips, P.C., Fitchburg, MA, for Chapter 7 Trustee.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before this Court are cross motions for partial summary judgment. The underlying dispute arises from the objection of David M. Nickless as Chapter 7 trustee (the "Trustee") to the secured claim filed by creditor Windsor Thomas Group, Inc. ("Windsor Thomas"). Windsor Thomas claims to hold a security interest in the realized proceeds from the Trustee's sale of the income stream from a winning Massachusetts lottery ticket ("the Sale"). The issue to be determined here is whether Windsor Thomas' claim is secured either by a perfected security interest or by an equitable lien arising from one or more prepetition state court orders.[1]

---

1. Notwithstanding Fed. R. Bankr.P. 7001(2) and 3007, neither party has requested application of Rules 7001, et. seq.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter. of law." Fed. R.Civ.P. 56©; Fed. R. Bank. P. 7056. The court must "scrutiniz[e] the record in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir. 1994) (citing *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Trustee objects to Windsor Thomas' claim in several respects. Above all else, however, the Trustee argues that Windsor Thomas does not hold a secured claim. Because this issue colors all others, the parties chose, at the Court's urging, to have this determined first. And with respect to this issue, both of the parties have met their preliminary burden to demonstrate that no triable issue of fact exists; no material fact is here disputed. This Court therefore reaches its conclusions as a matter of law.

## II. FACTS AND TRAVEL OF THE CASE

In 1995, Enrique M. Fraden (the "Debtor") purchased a winning "Wild Millions" lottery ticket issued by the Commonwealth of Massachusetts Lottery Commission (the "Lottery Commission"). The ticket entitled the Debtor to receive twenty annual payments of $50,000 (approximately $35,000 after taxes) (the "Lottery Payments").

From January 1996 through October 1998, Windsor Thomas made monetary advances to the Debtor. Coincident with the last advance, the Debtor signed an "Integrated and Restated Promissory Note" (the "Note") in favor of Windsor Thomas for $136,504.00—representing the total of advances made up to and including that date. The Debtor also executed a security agreement (the "Security Agreement") to secure payment of the Note. The Security Agreement purported to "assign, transfer, and set ... over" a security interest in the Debtor's "right, title, power, privilege and beneficial interest" in "those sixteen (16) annual payments ... due him as a result of winning the ... State Lottery" and "the rights of [the Debtor] in that certain ... State Lottery ... award." [2]

After the Debtor defaulted, Windsor Thomas filed a complaint (the "Complaint") against the Debtor in the Commonwealth of Massachusetts Superior Court Department of the Trial Court, Essex Division (the "Superior Court") in the summer of 1999, seeking to collect on the Note.[3] Approximately one year later, on May 10, 2000, Windsor Thomas filed a "Motion for Preliminary Injunction and for Reach and Apply" (the "First Injunction Motion"), seeking to enjoin the Lottery Commission from disbursing Lottery Payments to the Debtor, and seeking to enjoin

---

**2.** Windsor Thomas subsequently filed a UCC–1 financing statement with the Massachusetts Secretary of State on September 10, 2001. The financing statement covers "all right, title and interest to the remaining sixteen (16) annual payments ... as a result of winning the Massachusetts State Lottery ... to secure an Integrated and Restated Promissory Note ... together with Security Agreements ...".

**3.** The parties give different dates for the filing of the lawsuit, captioned *Windsor Thomas Group, Inc. v. Enrique Fraden, Sr.,* Civil Action No. 99–1279–F (the "Lawsuit"). Windsor Thomas states that the suit was filed on July 1, 1999, while the Trustee states that the Complaint was filed on June 18, 1999. The difference, however, is not material to the issues before the Court.

the Debtor from dissipating the next payment installment.[4]

Windsor Thomas warned in the First Injunction Motion that the Lottery Commission would issue a check to Debtor on June 15 of that year (2000). Windsor Thomas sought an order from the Superior Court that the Debtor

> be enjoined and restrained from endorsing or depositing his forthcoming lottery check or otherwise dissipating the proceeds of his lottery winnings and that the Massachusetts State Lottery Commission located in Braintree, Massachusetts from disbursing (sic) any lottery winnings to the Defendant.[5]

After a hearing, the Superior Court found that the preliminary injunction was warranted and ordered the Debtor to "deposit the full amount of the proceeds of any check received by him from the Lottery into Court within three days of receipt of such check" (the "First Injunction"). The request for an injunction against the Lottery Commission, however, was denied without prejudice.

The Debtor failed to comply with the terms of the First Injunction, endorsed the June 2000 check received from the Lottery Commission and dissipated the proceeds. Windsor Thomas then filed a Complaint for Civil Contempt (the "Civil Contempt Complaint") in September 2000 and was ultimately awarded its attorneys' fees.[6] Shortly before the anticipated disbursement of the next lottery check, Windsor Thomas filed a "Second Motion for Preliminary Injunction" (the "Second Injunction Motion"),[7] asking that the Debtor

> be enjoined from endorsing or depositing his forthcoming lottery check or otherwise dissipating the proceeds of his lottery winnings and that the [Debtor] deposit such check with the Court to hold until the resolution of the [lawsuit].

On May 31, 2001, the Superior Court endorsed the Second Injunction Motion as "allowed" (the "Second Injunction").[8] Shortly thereafter, on October 9, 2001, the Superior Court granted summary judgment in favor of Windsor Thomas.[9]

On March 12, 2002, Windsor Thomas filed an involuntary Chapter 7 petition against the Debtor. The Debtor failed to

---

4. Windsor Thomas caused a summons to be served upon the Lottery Commission, but it was never named as a defendant in the lawsuit.

5. This typographical error in Windsor Thomas' request for relief is clarified in the body of the First Injunction Motion, wherein Windsor Thomas "moves that the Court enjoin the Massachusetts State Lottery Commission located in Braintree, Massachusetts from disbursing any lottery winnings to the defendant prior to the resolution of [the Lawsuit]." The First Injunction Motion further requested that the Court require that the check be deposited with the Court to hold until resolution of the suit.

6. Although the copy of the Civil Contempt Complaint attached to Windsor Thomas' motion for summary judgment filed with this Court names both the Debtor and the Lottery

Commission as defendants, the Windsor Thomas motion for summary judgment represents that "Windsor Thomas sought to hold *the Debtor* in contempt ..." and it is clear that the order on the Civil Contempt Complaint ran only against the Debtor.

7. The Second Injunction Motion does not name the Lottery Commission as a defendant.

8. Apparently, the Debtor also failed to comply with the Second Injunction. Windsor Thomas, however, does not state whether contempt proceedings were initiated pursuant to the Second Injunction.

9. Windsor Thomas further states that the Superior Court denied the Debtor's subsequently-filed Motion for Reconsideration and that, although a Notice of Appeal was served on Windsor Thomas, no appeal appears on the docket.

answer or otherwise respond, and this Court entered an Order for Relief on April 30, 2002. Soon thereafter, the Trustee filed a "Motion to Compel Turnover of Lottery Proceeds" (the "Motion to Compel Turnover"). After a hearing, and no objections having been raised, this Court granted the Trustee's Motion to Compel Turnover on September 3, 2002.[10]

On March 13, 2003, the Trustee filed with this Court a "Motion By Trustee For Authority To Sell (Proceeds of a Winning Massachusetts Lottery Wild Millions Ticket) Estate Property Free and Clear of all Liens and Encumbrances" (the "Motion to Sell") and a "Notice of Intended Private Sale of Estate Property to Street Capital of Proceeds of a Winning Massachusetts Lottery Wild Millions Ticket" (The "Notice of Sale"). Again, no objections were raised. Following a hearing on June 3, 2003, this Court entered an order granting the Trustee's Motion to Sell and authorizing the sale of the Lottery Payments to Settlement Funding (a higher offeror) in the amount of $401,500.00.

Subsequent to the filing of the Motion to Sell and Notice of Sale, but prior to the actual order authorizing such sale, Windsor Thomas filed a Proof of Claim in the amount of $326,539.25 (plus additional interest and costs), based on "money loaned." [11] The Proof of Claim states that the claim is secured by "an equitable lien on the lottery proceeds from the reach and apply injunctive relief granted in state court." The Trustee objected to Windsor Thomas' assertion that it holds a secured claim in the Lottery Proceeds. Windsor Thomas filed its "Motion for Summary Judgment on the Trustee's Amended Omnibus Objection to Claims" (the "Summary Judgment Motion") asking this Court to find that its claim is secured. The Trustee responded with a "Memorandum of Law in Support of Trustee's Opposition to Motion of Windsor Thomas Group, Inc. for Summary Judgment on the Trustee's Amended Omnibus Objection to Claims and Trustee's Cross Motion for Summary Judgment" (the "Trustee's Motion").

III. *POSITIONS OF THE PARTIES*

Windsor Thomas first claims that it holds a valid and perfected security interest in the Lottery Payments pursuant to the Security Agreement and the late-filed financing statement. The Trustee argues that the Security Agreement was ineffective to create any security interest because the Security Agreement constituted a prohibited assignment of the Lottery Payments under Massachusetts General Laws ch. 10, § 28. Pursuant to that statute, "[n]o right of any person to a prize shall be assignable ..." [12] M.G.L. ch. 10, § 28

10. This Court's order specifically stated that the Massachusetts State Lottery Commission "shall turn over to [the Trustee] those funds representing the annual payment due to the Debtor." The Lottery Commission received notice of the Motion, but, as noted, raised no objections.

11. The amount of the claim is based, in part, on Windsor Thomas' contention that it is a secured creditor. The amount originally sought in the Superior Court case was $114,048. Windsor Thomas now calculates the amount of its claim at $326,539.25 because it argues that it is an *oversecured* creditor and thus entitled to post-judgment interest

and reasonable fees, costs and charges provided for in the underlying Note pursuant to 11 U.S.C. § 506(b). The amount of the claim that should be allowed is not presently before the Court, but will obviously be much influenced by the determination of Windsor Thomas' *status as a secured or unsecured creditor.*

12. M.G.L. ch. 10 § 28 reads in full:

*No right of any person to a prize shall be assignable,* except that payment of any prize may be made to the estate of a deceased prize winner or to the IV–D agency as set forth in chapter one hundred and nineteen A, and except that any person pursuant to

(2000).[13] The Trustee relies on recent decisions by the Massachusetts Supreme Judicial Court (the "SJC") and the Massachusetts Appeals Court for the proposition that M.G.L. ch. 10, § 28 creates a bright-line rule prohibiting voluntary assignments of lottery prizes, including the pledge of lottery prizes as collateral under promissory notes and security agreements.[14]

Windsor Thomas argues that this case is distinguishable because it holds a security interest not in the prize but in "the *proceeds* of [the Debtor]'s ownership interest in lottery payments." Once issued to the winner, Windsor Thomas says, a creditor may hold a secured interest in the proceeds of the prize. Because Windsor Thomas believes that it holds a valid and perfected security interest, it claims that the interest attached to the proceeds of the Sale. The Trustee responds by noting the

absence of legal authority for Windsor Thomas' position, by demonstrating similarities between the security agreement at issue in *Midland States* and the Security Agreement in this case, and by dismissing Windsor Thomas' attempt to differentiate the "proceeds" of the Debtor's interest in the income stream from the Lottery Commission from the Lottery Payments. Finally, the Trustee argues that even if Windsor–Thomas had perfected a prepetition security interest in the Lottery Payments, 11 U.S.C. § 552(b)(1) precludes the extension of that perfected pre-petition lien to the proceeds of the Sale.[15]

Windsor Thomas further asserts that it is secured by virtue of an equitable lien which arose from its action to reach and apply filed in conjunction with the First Injunction Motion. Under Massachusetts

---

an appropriate judicial order may be paid the prize to which the winner is entitled, and except that the commission may, by regulations adopted pursuant to section twenty-four, permit assignment of prizes for purposes of paying estate and inheritance taxes, or to a trust the beneficiaries of which are the prize winner, his mother, father, children, grandchildren, brothers, sisters, or spouse. Neither the commission nor the director shall be liable for the payment of a prize pursuant to this section. This section prevails over section 9–405 of chapter 106.

M.G.L. ch. 10 § 28 (2000) (emphasis added).

The foregoing provision was amended effective on July 1, 2004. However, since all relevant facts in this case occurred prior to that date, the earlier version applies here.

**13.** This Court's authority to approve the sale of the Lottery Payments is not in question. Article I, § 8, cl. 4, of the United States Constitution and 11 U.S.C. § 541(c)(1) aside, this Court's order permitting the estate representative to sell the Lottery Payments is an "appropriate judicial order" under M.G.L. ch. 10 § 28.

**14.** *Singer Friedlander Corp. v. State Lottery Comm'n*, 423 Mass. 562, 670 N.E.2d 144, 146–47 (1996) (M.G.L. ch. 10, § 28 "prohibits

all assignments of rights to lottery prize money"); *Midland States Life Ins. Co. v. Cardillo*, 59 Mass.App.Ct. 531, 797 N.E.2d 11, 13–14 (2003) (declaring as invalid under M.G.L. ch.10, § 28 a promissory note and security agreement identifying the collateral as "all of Debtor's right, title and interest to ... lottery payments").

**15.** Pursuant to 11 U.S.C. § 552(b)(1),

if a debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to the property of the debtor acquired before the commencement of the case and proceeds ... of such property, then such security interest extends to such proceeds ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law.

The Trustee contends that there is no language in the prepetition Security Agreement extending the security interest to proceeds of the subject property; therefore, Windsor Thomas can not have a postpetition security interest in the proceeds of the Sale. Because this Court finds that no valid security interest was created, it need not reach this issue.

law, a creditor who obtains an injunction against a debtor's transfer of property in connection with an action under M.G.L. ch. 214, § 3(6) to reach and apply [16] property of the debtor obtains an equitable lien in the property. *McCarthy v. Rogers*, 295 Mass. 245, 246–47, 3 N.E.2d 787 (1936). Because the First Injunction ordered the Debtor to deposit "any check" into the court, and the First and Second Injunctions prohibited the Debtor from "dissipating the proceeds of his lottery winnings," Windsor Thomas argues that the Injunctions were not limited solely to the two checks disbursed to the Debtor shortly after Injunctions took effect. Instead, Windsor Thomas believes the Injunctions applied to the entire income stream from the Lottery and that it therefore obtained an equitable lien in the Lottery Payments.

In response, the Trustee first argues that because the Lottery Payments are not assignable under state law, they can not be subject to an equitable lien. Second, the Trustee contends that even if an equitable lien may attach to the Lottery Payments, the Injunctions could not be interpreted as extending to the entire payment stream. Noting that each Injunction refers to "check" in the singular, and relying on traditional contract law for the proposition that ambiguities are to be construed against the drafter, the Trustee argues that each Injunction applied only to the single forthcoming check referenced in the respective motions and, therefore, that any equitable lien extended only to those specifically-referenced checks.

Furthermore, the Trustee notes that the bill to reach and apply was denied as to the Lottery Commission and that neither the First Injunction nor the Second Injunction contained language constraining the Lottery Commission. Since Massachusetts cases have held that third parties in possession of a defendant's property, or who owe a debt to the defendant, must be joined as a party defendant in an action to reach and apply that property, *See Aylward v. Lawrence Sav. Bank (In re Osgood)*, 203 B.R. 865, 869 (Bankr.D.Mass. 1997); *Mass. Elec.Co. v. Athol One, Inc.*, 391 Mass. 685, 462 N.E.2d 1370, 1372 (1984), the Trustee argues that Windsor Thomas' failure to obtain injunctive relief against the Lottery Commission defeats any claim to an equitable lien on the Lottery Payments.

In support of its contention that at least the First Injunction extended to all payments made from the Lottery Commission to the Debtor, Windsor Thomas points out that it *did* name the Lottery Commission in the First Injunction Motion. Furthermore, Windsor Thomas argues that the language of the Second Injunction Motion, which sought injunctive relief only as to the Debtor, does not control, because the First Injunction continued in force and the Second Injunction Motion was filed solely as a " 'belt and suspenders' approach to trying to collect the debt."

## IV. DISCUSSION

### A. The Security Agreement

#### 1. Choice of Law

 The only issue now before this Court is whether Windsor Thomas is a

---

**16.** M.G.L. ch. 214, § 3(6) provides, in relevant part:

The supreme judicial and superior courts shall have original and concurrent jurisdiction of the following cases:
. . .
(6) Actions by creditors to reach and apply, in payment of a debt, any property, right,

title or interest, legal or equitable, of a debtor . . . which cannot be reached to be attached or taken on execution although the property sought to be reached and applied is in the possession or control of the debtor independently of any other person or cannot be reached and applied until a future time or is of uncertain value . . .

secured creditor. Because the parameters of valid security interests are governed by state law,[17] this Court must determine which state law governs. Yet, the choice of law issue in this case has been virtually unaddressed.[18] For the reasons below stated, this Court concludes that Massachusetts law is the applicable law to apply in determining the validity of the security agreement.

■ First, although the Security Agreement references Florida law, it does so only in the context of the debtor's default and the subsequent rights of the Debtor and creditor. The Security Agreement fails to specify the law that shall govern, *inter alia*, its validity or interpretation. Transactions governed by the Uniform Commercial Code, such as the one *sub judice*,[19] and for which the parties

have failed to specify applicable law, will be subject to the forum state's version of § 1–105 of the UCC, so long as the transaction bears an "appropriate relation" to the forum state.[20] *See* UCC § 1–105; M.G.L. ch. 106 § 1–105; *Travenol Labs., Inc. v. Zotal, Ltd.*, 394 Mass. 95, 474 N.E.2d 1070, 1073 (1985).

■ Since the Debtor, the collateral and the third party with responsibility over the collateral (the Lottery Commission) have at all relevant times been located within the Commonwealth of Massachusetts, it is beyond question that the transaction bears an "appropriate relation" to Massachusetts. Pursuant to *Travenol*, Massachusetts common-law conflicts analysis has been read into § 1–105 and informs decisions regarding which law is applicable in a particular case.[21] Massa-

---

17. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (the "determination of property rights in the assets of a bankrupt's estate" is governed by state law; the rule adopted by the Court "looks to state law to define the security interest").

18. The potential conflicts of law issue arises from two sources. First, in the absence of any specification by the parties as to which law shall apply, this Court must make the appropriate choice of law decision. Second, this Court takes notice of the reference to Florida law in paragraph (3) of the Security Agreement, which states that in the event of Debtor's default,

> the Secured Party shall have all the rights, options and remedies respecting the sale or the disposition of said Interest, and the collection of any deficiency, as provided in the Uniform Commercial Code of Florida .... and Debtor shall have all rights to which Debtor is entitled under said Uniform Commercial Code of Florida...

19. Article 9 of the Uniform Commercial Code governs secured transactions, including relevant security agreements entered pursuant thereto. UCC § 9–203.

20. Comment 2 to § 9–301 (addressing the law governing perfection and priority) specifically

states that "the law applicable to issues such as attachment, validity, characterization, and enforcement is governed by the rules in Section 1–105 ..." Massachusetts has codified UCC § 1–105 without amendment. M.G.L. ch.106 § 1–105 provides:

> (1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. *Failing such agreement this chapter applies to transactions bearing an appropriate relation to this state.*

(emphasis added).

21. In *Travenol*, the SJC specifically held that:

> [E]stablished conflicts principles "are a useful starting point in determining whether the Commonwealth of Massachusetts bears an 'appropriate relation' to a given transaction or occurrence." *See Skinner v. Tober Foreign Motors, Inc.*, 345 Mass. 429, 432, 187 N.E.2d 669 (1963).... [W]e conclude that G.L. c. 106 § 1–105(1) authorizes this court to apply Massachusetts common law conflicts principles to commercial transactions.

474 N.E.2d at 1073.

34

chusetts common law conflicts rules embrace a "functional choice-of-law approach that responds to the interests of the parties, the states involved, and the interstate system as a whole." *Bushkin Assoc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668 (1985). According to the SJC, the general principles of the Restatement (Second) of Conflicts of Laws (1971) provide guidance for resolving conflicts issues arising in relation to contracts.[22]

■ In light of the factors set forth by the Restatement (Second) §§ 6(2) and 188(2), this Court concludes that Massachusetts law is the most appropriate law to be applied in this case. As previously noted, the Debtor, collateral and Lottery Commission are all located in Massachusetts. This Court has been presented with no information regarding the place of contract negotiation or execution. Most important, however, the subject matter of the Security Agreement touches upon important issues of Massachusetts statutory law and legislative policies regarding lottery

winnings.[23] Were Florida law to govern the validity of the Security agreement, there exists at least the risk that these policies would be defeated. Given the extensive contacts with Massachusetts and the stated Massachusetts policy concerns, particularly in the absence of a demonstrated countervailing Florida policy that would be affected by the application of Massachusetts law, the validity of the Security Agreement should be construed in accordance with Massachusetts law.

■ Even if this Court were to find that the parties drafted a generally enforceable choice of law provision designating Florida law as controlling the validity and interpretation of the Security Agreement, the result would be the same. Although this Court has previously noted that "Massachusetts courts routinely enforce choice of law provisions ..." *N. Parent, Inc. v. Cotter & Co. (In re N. Parent, Inc.)*, 221 B.R. 609, 619 (Bankr.D.Mass. 1998); *See also Hodas v. Morin*, 442 Mass. 544, 814 N.E.2d 320, 324–25 (2004); *Mor-*

**22.** To determine which state has the most significant relationship to a particular issue, the Restatement (Second) sets forth a general set of guidelines:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
Restatement (Second) § 6(2). More specifically, when these principles are applied to a contract issue, the Restatement (Second) § 188(2) directs attention to:
(a) the place of contracting,
(b) the place of negotiating the contract,
(c) the place of performance,

(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties

**23.** Important policies underlie the legislature's enactment of M.G.L. ch. 10 § 28. One such policy is to "prevent the creation of a secondary, unregulated market in winning tickets ..." *Welford v. Nobrega*, 30 Mass.App. Ct. 92, 565 N.E.2d 1239, 1245 n. 10 (1991), *aff'd*, 411 Mass. 798, 586 N.E.2d 970 (1992); *see also Koonce v. McDonald (In re Koonce)*, 262 B.R. 850, 858 (Bankr.D.Nev.2001) (finding that a voluntary assignment of Massachusetts lottery proceeds violated Massachusetts law).

In addition, the anti-assignment law prevents "endless administrative expense and risk of potential liability if the Lottery were required to reexamine the status of prize winners on a regular basis." *Midland States Life Ins. Co. v. Cardillo*, 59 Mass.App.Ct. 531, 797 N.E.2d 11, 16 (2003).

*ris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, 888 (1982) and "bankruptcy courts have similarly upheld choice of law provisions ..." *N. Parent*, 221 B.R. at 619, this general deference to parties' choice of applicable law is subject to the requirement that such law does not substantially conflict with Massachusetts public policy. *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 646 N.E.2d 741, 744 (1995); Restatement (Second) § 187(2)(b) (parties' choice of law generally governs, unless the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue ...") [24]

■ Finally, regardless of substantive legal arguments requiring the application of Massachusetts law, this Court finds that the parties have effectively made their choice of law through the course of this case. At no time has either party raised the choice of law issue. Instead, both Windsor Thomas and the Trustee have presented their arguments, both oral and written, in light of Massachusetts law. Therefore, to the extent that any colorable argument in favor of the application of Florida law exists, this Court now deems any such choice of law argument waived.[25]

### 2. Validity of Security Agreement

■ The SJC, in *Singer Friedlander Corp. v. State Lottery Commission*, held that, as regards M.G.L. ch. 10 § 28, even voluntary assignments of lottery winnings that are approved by a court will be held invalid under Massachusetts law. 423 Mass. 562, 670 N.E.2d 144, 146 (1996) ("[t]he prohibition of prize assignments, rather than the allowance of assignments, must be assumed to constitute the legislative policy ...").[26] In so holding, the SJC

**24.** Subsection (b) goes on to say that the state with the materially greater interest must also, under § 188, "be the state of the applicable law in the absence of an effective choice of law by the parties." As previously discussed, Massachusetts is, indeed, the state of applicable law in the absence of a contrary choice. Notably, Florida courts also use the Restatement (Second) of Conflicts of Laws to determine whether a choice of law provision should be determinative. *See, e.g., Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980); *Beattey v. College Centre of Finger Lakes, Inc.*, 613 So.2d 52, 53 (Fla.App.1992). Given the overriding interest of Massachusetts in the assignability of lottery winnings, it is most likely that a Florida court would also interpret the validity of the Security Agreement pursuant to Massachusetts law.

**25.** Other jurisdictions have similarly concluded that a party's failure to raise choice of law issues in a timely manner, especially where the party has consistently argued in court and in memoranda under a particular state's law, results in the waiver of any subsequently-raised choice of law argument. *See, e.g., Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986); *Touche Ross Ltd. v. Filipek*, 7 Haw.App. 473, 778 P.2d 721 (1989); *Clarklift*

*of Northwest Ohio, Inc. v. Clark Equip. Co.*, 869 F.Supp. 533 (N.D.Ohio 1994); *Tennant Co. v. Martin's Landscaping, Inc.*, 40 Conn. Supp. 475, 515 A.2d 665 (1986).

**26.** M.G.L. ch. 10, § 28 contains three "exceptions" to the general prohibition against assignment of lottery winnings: (1) payment of the lottery prize may be made to the estate of a deceased winner; (2) lottery regulations may permit assignment to pay estate and inheritance taxes or to pay a trust set up for the benefit of "the prize winner, his mother, father, children, grandchildren, brothers, sisters or spouse"; and (3) payment may be made to any person pursuant to an "appropriate judicial order."

In *Singer Friedlander*, however, the SJC narrowly construed the "appropriate judicial order" exception, quoting with approval a Massachusetts Appeals Court case involving the same statute and similar issues:

> If the "appropriate judicial order" exception were to freely permit voluntary assignments for any reason with leave of the court, the exception would entirely swallow the general rule that "[n]o right of any person to a prize shall be assignable." ...

has made it clear that the exceptions to anti-assignability under M.G.L. ch. 10, § 28 will be strictly construed.

 Relying on *Singer Friedlander*, a Massachusetts Appeals Court has recently held that agreements pledging future payments of lottery winnings in exchange for loans are "invalid attempts to circumvent [M.G.L. ch.10,] § 28 and the rule of *Singer Friedlander*." *Midland States Life Ins. Co. v. Cardillo*, 59 Mass.App.Ct. 531, 797 N.E.2d 11, 14 (2003). As the court noted in *Midland States*, Massachusetts law has long recognized the pledge of collateral as security for a loan as a voluntary assignment. *Midland States*, 797 N.E.2d at 17 (citing *O'Connell v. Worcester*, 225 Mass. 159, 114 N.E. 201 (1916)) ("An order given as security for a present indebtedness operates as an assignment . . .") and *Heffernan v. Wollaston Credit Union*, 30 Mass. App.Ct. 171, 567 N.E.2d 933 (1991) ("The right to grant a security interest falls with-

in the 'ordinary and reasonable meaning of the authority to assign or transfer' ").[27]

 This Court finds the reasoning in *Midland States* persuasive, and agrees that M.G.L. ch. 10 § 28 establishes a "bright-line rule . . . making clear that the lottery statute and regulations preclude the assignment of lottery proceeds [as collateral to secure a loan]." 797 N.E.2d at 18. Despite Windsor Thomas' creative attempt in its Summary Judgment Motion to circumvent the anti-assignment law by characterizing its interest as one in the "proceeds" of the Debtor's interest in the Lottery Payments, this Court can discern no meaningful distinction between the prize and its proceeds. Furthermore, the language of the Security Agreement clearly demonstrates an attempt to create a security interest in the right to receive the income stream from the Lottery Commission directly.[28] Since the creation of such

---

Such a construction is contrary to the principle that statutory exceptions should be construed narrowly . . .
670 N.E.2d at 146 (quoting *Korkuch v. Planning Bd. of Eastham*, 26 Mass.App.Ct. 307, 526 N.E.2d 1301 (1988)).

27. Courts in other jurisdictions with similar anti-assignment provisions have likewise held that granting a security interest in lottery winnings as collateral violates the prohibition against voluntary assignment of lottery payments. *See, e.g., Singer Asset Fin. Co. v. Duboff Family Invs. (In re Duboff)*, 290 B.R. 652, 656 (Bankr.C.D.Ill.2003); *Midland States Life Ins. Co. v. Hamideh*, 311 Ill.App.3d 127, 243 Ill.Dec. 723, 724 N.E.2d 32, 36 (1999); *Converse v. The State Lottery Comm'n*, 56 Wash. App. 431, 783 P.2d 1116, 1118–19 (1989); *Wolf v. Brach*, 241 A.D.2d 417, 418, 660 N.Y.S.2d 430 (1997).

28. The Security Agreement reads more fully as follows:

(1) Debtor assigns, transfers, and sets over unto Secured Party a *security interest in all of his right, title, power, privilege and beneficial interest* (hereinafter collectively re-

ferred to as the "Interest") *in and to his interest in*
(a) *those sixteen (16) annual payments* in the amount of $33,500.00 (said payments being net of then current year federal and state income tax withholding attributable thereto) beginning June 21, 1999, and ending on June 21, 2014, inclusive, *due him as a result of winning the Massachusetts State Lottery* Wild Millions drawing of June 21, 1995. This property is a general intangible. This property is personal property.
(b) *the remaining sixteen (16) annual payments* beginning June 21, 1999, and ending on June 21, 2014, inclusive, *due him as a result of winning the Massachusetts State Lottery* Wild Millions drawing of June 21, 19995, to the extent permitted by law, both before and after same are made, and
(c) the personal property of Enrique M. Fraden to wit: the *rights of Enrique M. Fraden in that certain Massachusetts State Lottery Wild Millions Lottery award* won by Enrique M. Fraden on June 21, 1995.
. . .
(emphasis added)

an interest is prohibited by Massachusetts law, M.G.L. ch. 10, § 28; *Singer Friedlander,* 670 N.E.2d 144; *Midland States,* 797 N.E.2d 11, Windsor Thomas has not achieved a valid perfected security interest through the execution of the Security Agreement and subsequent filing of the financing statement.[29]

### B. The Equilibrium Lien

 Under Massachusetts law, a statutory action to reach and apply is available to a non-judgment creditor "to subject to the satisfaction of his particular claim ... specific property of the defendant..." *McCarthy v. Rogers,* 295 Mass. 245, 3 N.E.2d 787, 788 (1936); M.G.L. ch. 214, § 3(6) (2004). When the creditor also obtains a temporary restraining order or preliminary injunction preventing the defendant from disposing of, transferring or assigning the property sought to be reached and applied, the property "is charged with an equity for the security of the plaintiff, and is taken directly into the control of the court. In this respect [reach and apply is] as effectual as an attachment at law by trustee process." *Snyder v. Smith,* 185 Mass. 58, 69 N.E. 1089, 1090 (1904). This process, sometimes also called "equitable attachment," *id.,* gives rise to "an equitable lien upon [the property], which is good as against other creditors and which is entitled to recognition in bankruptcy proceedings." *McCarthy,* 3 N.E.2d at 788.[30]

The Trustee argues that, despite the Injunctions issued by the Superior Court in connection with Windsor Thomas' action to reach and apply, no equitable lien could attach to the Lottery Payments because M.G.L. ch. 10, § 28 prohibits their assignment. *See Aylward v. Lawrence Savings Bank (In re Osgood),* 203 B.R. 865, 870 (Bankr.D.Mass.1997) (citing Michael C. Gilleran, *Massachusetts Prejudgment Security Devices: Attachment, Trustee Process, and Reach and Apply,* Mass. L.Rev. 156, 169–70 (1984) (to obtain an equitable lien, "the property must [ ] be assignable")). The question of whether lottery winnings may be reached and applied (or subject to similar processes, such as attachment) despite a general prohibition on assignment has not been addressed by the SJC. Furthermore, this Court can find no consensus among courts of other jurisdictions as to whether similar anti-assignability provisions prevent attachment of lottery winnings.[31]

---

**29.** Unfortunately for Windsor Thomas, even if this Court were to accept its characterization of the security interest, such a finding would still defeat the ultimate claim for security in the proceeds of the Sale of the Lottery Payments. According to Windsor Thomas' argument, it would have a secured interest only in funds actually disbursed to and received by the Debtor—however, if there is no secured interest in the Lottery Payments, there is no secured interest in the proceeds from the sale of those payments.

**30.** The rule that an injunction issued in connection with an action to reach and apply gives rise to an equitable lien on the property continues to be recognized in Massachusetts. *See, e.g., Xerox Fin. Serv. Life Ins. Co. v. Sterman (In re Sterman),* 244 B.R. 499, 513 (D.Mass.1999); *Foxborough Sav. Bank v. Ballarino (In re Ballarino),* 180 B.R. 343, 348 (D.Mass.1995); *Bank of New England, N.A. v. Mortgage Corp. of New England,* 30 Mass.App. Ct. 238, 567 N.E.2d 961, 963 (1991); *Bank of Boston v. Haufler,* 20 Mass.App.Ct. 668, 482 N.E.2d 542 (1985).

**31.** *Compare, e.g., Livingston v. Unis,* 659 A.2d 606, 610 (Pa.Commw.Ct.1995) (lottery prizes may be subject to attachment or garnishment if an "appropriate judicial order" is issued) *with State v. Ohio State Lottery Comm'n,* 34 Ohio App.3d 232, 517 N.E.2d 1029, 1034 (1986) (since the legislature did not specifically provide that lottery winnings may be attached, the anti-assignment clause should be interpreted as prohibiting attachment by creditors).

It is unnecessary, however, for this Court to make a definitive ruling on an unsettled issue so squarely within the province of state law, since, even if an equitable lien on lottery winnings were achievable under Massachusetts law, Windsor Thomas still could not have acquired such a lien on the Lottery Payments. Under Massachusetts law, when a creditor seeks an equitable lien on property held by a third party, but due or owing to the debtor, "the holder of this property must be joined as a party defendant in an action to reach and apply..." *Mass. Elec. Co. v. Athol One, Inc.*, 391 Mass. 685, 462 N.E.2d 1370, 1372 (1984) (citing *William J. McCarthy Co. v. Rendle*, 222 Mass. 405, 111 N.E. 39 (1916)); *Osgood*, 203 B.R. at 871 (third party is a "necessary party to an action to reach and apply"). The failure to include such third party as a defendant will defeat an equitable lien claim against specific property. *See, e.g., Osgood*, 203 B.R. at 871; *Rendle*, 111 N.E. 39; *Athol One, Inc.*, 462 N.E.2d 1370; *Haufler*, 482 N.E.2d 542. Because Windsor Thomas failed to name the Lottery Commission as a defendant in the Second Injunction Motion, no equitable lien on funds held by the Lottery Commission for the benefit of the Debtor (the Lottery Payments) arose from the Second Injunction ordered by the Superior Court.

As to the First Injunction Motion and First Injunction, Windsor Thomas points out that it *did* name the Lottery Commission as a defendant and sought injunctive relief against the Lottery Commission. This, alone, was likewise insufficient to create an equitable lien against the remaining Lottery Payments. In *In re Osgood*, a creditor claimed that it had established an equitable lien on the income stream from an industrial revenue bond issued to the debtor. *Osgood*, 203 B.R. at 868. Although the creditor obtained an injunction against the *debtor* from selling, transferring or otherwise assigning its rights under the bond, the creditor failed to commence an action to reach and apply against the trustee holding the bond and charged with the responsibility of issuing principal and interest to the debtor. *Id.* at 871. Judge Feeney ruled that "[t]he [creditor's] failure to restrain [the trustee of the bond] from making payments to the Debtor [was] fatal to its contention that, through its Motion and injunction, it acquired an equitable lien against the bond." *Id.*

Although Windsor Thomas initially named the Lottery Commission as a defendant in the First Injunction Motion, the Superior Court denied the bill to reach and apply against the Lottery Commission. While the *Osgood* court's focus on the creditor's failure to *commence* an action to reach and apply against the third party was there appropriate, it was the "*failure to restrain*" the third party that was fatal to the creditor's claim of an equitable lien. *Id.* (emphasis added). Without an injunction entered in combination with a *successful* bill to reach and apply against the Lottery Commission, Windsor Thomas could obtain no lien on the stream of payments from the Lottery Commission to the Debtor under Massachusetts law.

Neither the First nor the Second Injunction actually contained language restraining the Lottery Commission from disbursing the Lottery Payments. Absent such language, even if the Injunctions were intended to cover current *and* future Lottery payments (as Windsor Thomas contends) the Injunctions would still be effective only against the Debtor. As the Massachusetts Appeals Court has noted:

> [A]n *injunction by itself ... does not operate to create a lien on property held by one* (in this case, the Commonwealth) *not subject to the injunction.* The earli-

est the lien could attach to the proceeds was when the Commonwealth paid them over to [third parties], who were then subject to the . . . injunctions.

*Haufler,* 482 N.E.2d at 547 (emphasis added). Because the Lottery Commission was not subject to either the First or Second Injunction, it follows that no "appropriate judicial order" giving rise to an equitable lien was created in the Lottery Payments. And because no equitable lien attached to the Lottery Payments, it follows that no lien attached to the proceeds of the Sale of those payments.

## V. CONCLUSION

For the foregoing reasons, this Court grants partial summary judgment in favor of the Trustee and denies similar relief to Windsor Thomas. Windsor Thomas shall be deemed an unsecured creditor in this case. A separate Order in conformity with this Memorandum of Decision, and setting a further pre-trial to determine the amount of the Windsor Thomas claim shall enter herewith.