BANK OF NEW ENGLAND, N.A. *vs.* MORTGAGE
CORPORATION OF NEW ENGLAND & others[1]
(and three companion cases[2]).

No. 91-P-129.

Suffolk. March 7, 1991. - March 14, 1991.

Present: SMITH, JACOBS, & GREENBERG, JJ.

*Lien. Injunction. Practice, Civil,* Injunction, Appeal, Judicial discretion.

Discussion of the instances in which a judge may appropriately consider
    harm to the public interest in granting or denying preliminary injunc-
    tive relief. [245-247]
In the context of four consolidated civil actions, arising from certain com-
    mercial loans among private parties, the judge used an improper stan-
    dard — harm to the public interest — in dissolving preliminary injunc-
    tions previously granted in connection with a plaintiff's statutory claims
    to reach and apply. [247-248]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment, two on December 14, 1990, and one each on December
20, 1990, and December 24, 1990.

After motions for preliminary injunctive relief were heard
by *Hiller B. Zobel,* J., and *Patrick J. King,* J., all pending
actions were consolidated and heard by *Zobel,* J.

---

[1] Harold Brown and certain others with interests in Mortgage
Corporation of New England. Also Hamilton Management Corporation,
as general partner of Hamilton Realty Limited Partnership, and
Buttonwood Corporation, as general partner of Buttonwood Associates
Limited Partnership, were named as reach and apply defendants.

[2] One of the companion cases is a suit by the Bank of New England,
N.A., against Hamilton Management Corporation and others, including
Harold Brown, individually. Hamilton Mortgage Corporation, as general
partner of Atrium on the Commonwealth Limited Partnership, Linhart
Associates Limited Partnership and W & T Associates Limited
Partnership, were named as reach and apply defendants. The two other
companion cases were brought by The First National Bank of Boston (now
Bank of Boston) and Fleet National Bank, respectively, against Harold
Brown and others.

*Andrew C. Griesinger* for Bank of New England, N.A.
*Douglas G. Moxham* for Harold Brown.

SMITH, J. A Superior Court judge dissolved preliminary injunctions by virtue of which the Bank of New England, N.A. (BNE) had held equitable liens on Harold Brown's ownership interests in certain limited partnerships. BNE filed a notice of appeal in the Superior Court under the second paragraph of G. L. c. 231, § 118, and also filed a petition for review in the single justice session of this court under the first paragraph of G. L. c. 231, § 118. The single justice denied relief but expedited the hearing of the appeal. See *Demoulas Super Mkts., Inc.* v. *Peter's Mkt. Basket, Inc.,* 5 Mass. App. Ct. 750, 753 (1977). A panel of this court issued an order on March 12, 1991, and we now issue this opinion.

We summarize the facts necessary to frame the issues. Brown and the various limited partnerships, corporations, and trusts (entities) in which he holds a substantial interest, own approximately 3,000 residential units and 10,200,000 square feet of commercial space in New England. Of that total, 1,500 residential units and 4,000,000 square feet of commercial space are located throughout the Boston metropolitan area. At the present time, approximately 3,000 tenants live in the residential properties in Boston. The entities, holding title to all of the properties, owe $660,000,000 in mortgage loans and other obligations to various lending institutions throughout the country. Brown is a personal guarantor on $600,000,000 of those loans and obligations.

Because of the economic downturn throughout the region, the lenders have not received payments as scheduled in their various agreements with Brown and the entities. Sometime in 1990, Brown and his advisors began negotiations with the lenders to restructure these debts. Participants in the negotiations include BNE, Bank of Boston, Fleet National Bank (Fleet) and numerous other banks.

On December 14, 1990, BNE filed two related verified complaints in the Superior Court in Suffolk County, seeking to recover over $13,000,000 it claimed was owed on several loans guaranteed by Brown. One complaint named Mortgage

Corporation of New England (MCNE), Brown and others as defendants, and sought over $7,000,000. The other complaint sought over $6,000,000 and named Hamilton Management Corporation (Hamilton), Brown, and others as defendants. Both complaints contained counts in the nature of statutory actions to reach and apply Brown's ownership interest in certain named limited partnerships. See G. L. c. 214, § 3 (6). BNE requested preliminary injunctions in connection with its statutory reach and apply counts and filed appropriate affidavits.[3]

Brown opposed BNE's requests for injunctive relief and filed a six-page affidavit. In it, he made a "falling domino" argument in support of his position. He claimed, among other things, that (a) the entities own or manage a substantial number of commercial buildings and residential apartment buildings; (b) he was engaged in "restructuring" negotiations with various of his bank creditors, including BNE; (c) "[t]he restructuring negotiations with the banks are in a critical stage [and] [i]f an injunction . . . were to be granted . . ., the other lenders will perceive the order as an attempt by BNE to improve its position in the restructuring efforts . . . [and], any injunctive relief . . . will surely result in the other lenders calling their loans and will destroy the restructuring efforts currently underway"; (d) "[i]f the restructuring negotiations fail due to the granting of an equitable lien to BNE, I [Brown] will have no choice but to file for protection under Chapter 11 of the Bankruptcy Code . . .," and (e) "such relief [if granted] will have the effect of cutting off all services to tenants owned by the limited partnerships and causing Hamilton . . . to lay off its employees and cease management services."

In his affidavit, Brown claimed that it was not in the public interest that the BNE's requests for injunctive relief be granted. He stated:

---

[3]BNE is not a judgment creditor. Therefore, its filing of actions to reach and apply could not have created equitable liens without an injunction. See Nolan, Equitable Remedies § 382, at 460-461 (1975 & Supp. 1990).

. . .

"14. Both the balance of harms and the public's interest weigh heavily against the granting of any equitable liens. As discussed above, any equitable lien will have the effect of destroying the restructuring negotiations and forcing the limited partnerships and myself into bankruptcy.

"15. In today's fragile economy, the public's interest can hardly be served by forcing one of New England's largest landlords into bankruptcy. Indeed, the public's interest will be better . . . served by allowing me, the corporation and the limited partnerships to complete the restructuring currently under way and to continue the management and services provided to numerous Boston residents . . . ."

. . .

We summarize Brown's arguments against the granting of the injunctions:

(1) The granting of the injunctions would create equitable liens in favor of BNE. *Bank of Boston* v. *Haufler*, 20 Mass. App. Ct. 668, 673-674 (1985). Nolan, Equitable Remedies § 382, at 460-462 (1975 & Supp. 1990);

(2) Those liens would have priority over any subsequently created liens. *Bank of Boston* v. *Haufler, supra* at 674;

(3) Such liens, therefore, would improve BNE's position in the restructuring efforts and consequently might induce other lenders to call their loans. Such actions may destroy the restructuring efforts and force Brown into bankruptcy;

(4) The potential harm to the public of an unnecessary and premature bankruptcy would be catastrophic to the Boston real estate community, and include the possibility that many residential tenants' services would be adversely affected.

Although BNE's two actions were related, its request for a preliminary injunction in each case was heard by a different Superior Court judge. The results, however, were the same. On December 21, 1990, BNE's request for a preliminary injunction in the complaint naming Hamilton and Brown as

defendants was granted. On December 24, 1990, another Superior Court judge granted BNE a preliminary injunction in its complaint against MCNE and Brown. Both judges expressly found that "the plaintiff [BNE] is likely to succeed on the merits, that the balance of hardships weighs in the plaintiff's favor, and that the plaintiff likely will be denied its damage remedy at law if injunctive relief is not granted."

As a result of the granting of a preliminary injunction on each complaint, equitable liens were created in BNE's favor on Brown's ownership interest in five limited partnerships. BNE's liens, as Brown had argued, had priority over any subsequently created liens. *Bank of Boston* v. *Haufler, supra* at 674. However, if Brown went into bankruptcy within ninety days of the issuance of the preliminary injunctions, BNE's priority would be extinguished. See 11 U.S.C. § 547 (1988).

On December 20, 1990, before the issuance of the preliminary injunctions, two other creditors of Brown, Fleet and Bank of Boston, brought actions against Brown and various of the entities. Both creditors also sought equitable liens against Brown's interests in the entities. The matters came before the same judge who granted BNE a preliminary injunction on its MCNE complaint. The judge issued an order consolidating the MCNE action, the Hamilton action, the Fleet action, and the Bank of Boston action and assigned the consolidated case to himself. He also scheduled a hearing for December 27, 1990, on the Fleet and Bank of Boston motions for preliminary injunction.

At the December 27, 1990, hearing, Fleet and Bank of Boston, instead of pressing their motions for preliminary injunctions, argued that BNE's equitable liens should be dissolved in order to help foster the "restructuring" negotiations and to prevent BNE from obtaining a priority over any other creditor. Brown joined in Fleet and Bank of Boston's arguments. The judge, who had previously granted BNE a preliminary injunction in the MCNE action, thereby creating an equitable lien in its favor, stated that he would dissolve all liens but that he would restrain Brown and his related enti-

ties from conveying their assets, subject to an ordinary course of business exception. He asked Brown's counsel to prepare an order consistent with the judge's oral directions.

On January 3, 1991, the judge heard objections to the proposed order which had been submitted by Brown's counsel. The judge orally gave the following reason for his decision to dissolve the preliminary injunctions that he and another judge had granted in favor of BNE:

. . .

"Resolution of these matters, either in whole or in part, can and almost certainly will have a significant effect on matters deeply affecting the financial and indeed the general well-being of large numbers of people in the Boston area.

"The matter becomes even more of public concern when one considers what would be the likely effect, or the certain risk were Mr. Brown's various holdings to come under something other than an orderly means of disposition . . ..

". . . I wish to underline this court's deep concern that we are dealing here with quintessential matters of public concern, not merely with matters involving a real estate developer who is unable for whatever reason to make payments on the debt which the real estate secures . . .."

The judge said nothing to indicate that he had reconsidered or changed his prior findings that BNE had demonstrated a likelihood of success and that the balance of hardships weighed in BNE's favor.

On January 4, 1991, the judge filed a document entitled "Findings and Order." We quote those findings relevant to the issues raised on appeal:

. . .

"D. The magnitude of the Brown Group's real estate holdings (which includes over 3000 residential units) compels treating the Consolidated Cases as something

other than as a matter which merely involves competing rights of various lenders seeking to collect sums due on indebtedness. This complex of claims implicates a significant and compelling public interest, particularly (but not exclusively) with respect to an orderly resolution of the parties' often conflicting rights; and,

"E. On balance, a restraint on orderly resolution of the parties' respective rights, specifically on the already-commenced process of global settlement in which the parties, under the court's supervision, are engaged, is inimical to the public interest. Entering or continuing equitable and legal attachments will, in the present circumstances of delicately balanced negotiation, threaten the settlement prospects to such degree that the harm to the public interest will far outweigh the harm to the creditors from the denial or dissolution of such relief; and,

"F. Prompt resolution of the entire congeries of disputes, which is very much in the public interest, will be much more likely to occur if equitable and legal attachments are for the present, denied or dissolved; and,

"G. The circumstances of the entire litigation move this Court to exercise its general equity powers so as to promote and protect the public interest, and not simply the interests of the litigants."

. . .

The judge entered an order on January 4, 1991, nunc pro tunc, December 27, 1990, dissolving and vacating the preliminary injunctions granted to BNE (and therefore, the equitable liens in favor of BNE) against Brown and certain of his limited partnership interests.

The parties agree as to the standards that we must apply in reviewing the judge's actions. "Appellate review of a trial court order disposing of a preliminary injunction application . . . focuses on whether the trial court abused its discretion — that is, whether the court applied proper legal standards and whether the record discloses reasonable support for its evaluation of factual questions . . . . [S]ince our commis-

sions do not authorize us to sit as trial judges, we must exercise special care not to substitute our judgment for that of the trial court where the records disclose reasoned support for its actions." *Edwin R. Sage Co.* v. *Foley*, 12 Mass. App. Ct. 20, 25-26 (1981). *Carabetta Enterprises, Inc.* v. *Schena*, 25 Mass. App. Ct. 389, 392 (1988). A reviewing court tests only whether the judge has abused his discretion. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615-616 (1980). We "will not reverse if there is a supportable legal basis for the [trial] court's action even if, on final analysis, it may prove to be mistaken." *New England Patriots Football Club, Inc.* v. *University of Colo.*, 592 F.2d 1196, 1200 (1st Cir. 1979), quoted in *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.*, 10 Mass. App. Ct. 70, 75 (1980).[4]

It is clear from this record that the judge dissolved the injunctions solely on the basis of his finding that the equitable liens, previously granted, were not in the public interest. BNE claims that the judge used an improper standard when he considered the risk of harm to the public interest because the matter before him concerns only private parties. Brown argues that a judge may consider, in an appropriate case, the risk of harm to the public interest, and that in this matter such consideration is appropriate.

Massachusetts law differs from Federal law in that the public interest is not ordinarily considered in determining whether to grant a preliminary injunction. See *Hull Mun. Lighting Plant* v. *Massachusetts Mun. Wholesale Elec. Co.*, 399 Mass. 640, 648 (1987). "If the judge is convinced that failure to issue the injunction would subject the moving *party*

---

[4]There is no question that the judge had the authority to reconsider the granting of the preliminary injunctions, even when one of the injunctions was granted by another judge. *Riley* v. *Presnell*, 409 Mass. 239, 242 (1991)("[A]lthough a judge should not lightly undo the work of another judge . . . , the power to reconsider an issue remains in the court until final judgment"). As the parties recognize, the actions of the judge in this case resulted in a denial of the preliminary injunctions previously granted. Therefore, his actions must be examined in the light of the standards set forth in *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. at 615-618.

to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party." (Emphasis added.) *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. at 617.

There are some instances where the harm to the public interest may be considered in the granting or denial of a preliminary injunction. See *Commonwealth* v. *Mass CRINC,* 392 Mass. 79, 89-90 (1984)(Commonwealth is not required to demonstrate irreparable harm where opposing party's activities may adversely affect the public interest). Where a public entity is a party, a judge may weigh the risk of harm to the public interest when deciding a preliminary injunction motion. *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223, 234, 237 (1961). *Brookline* v. *Goldstein,* 388 Mass. 443, 447 (1983). *Biotti* v. *Selectmen of Manchester,* 25 Mass. App. Ct. 637, 640 (1988). See also *Hull Mun. Lighting Plant* v. *Massachusetts Mun. Wholesale Elec. Co.,* 399 Mass. at 648. The public interest may also be considered in a case between private parties where the applicable substantive law involves issues that concern public interest. See *Krebiozen Research Foundation* v. *Beacon Press, Inc.,* 334 Mass. 86, 99 (1956). *Planned Parenthood League, Inc.* v. *Operation Rescue,* 406 Mass. 701, 716 (1990).

We are aware that several decisions have recited that in an appropriate case a judge may consider the public interest. See, e.g., *Brookline* v. *Goldstein,* 388 Mass. 447; *Hull Mun. Lighting Plant* v. *Massachusetts Mun. Wholesale Elec. Co.,* 399 Mass. at 648; *Harris* v. *Commissioner of Correction,* 409 Mass. 472, 474 (1991). We have not been referred to any decision in Massachusetts or elsewhere, however, where an appellate court has held that in a dispute between a creditor and a borrower, a judge may consider harm to the public interest as a factor in granting or denying a preliminary injunction. In any event, we hold that this matter is not an appropriate case for a judge to consider harm to the public interest.

These cases involve private parties, creditors, and borrowers. When a claim of harm to the public interest is invoked, "[t]he court must determine whose interests it should consider by reference to the substantive law that will apply when the case goes to trial on the merits. An interlocutory decision about specific performance of a contract to make parts for a power plant should turn on the applicable contract law, not the plant's environmental impact. To consider interests irrelevant to the final decision at the preliminary stage will only increase the cost of the litigation and undermine the substantive law. Those whom the law excludes from protection at the final hearing have no greater claim to be taken into account earlier. This is implicit in the basic perception that preliminary relief guards against irreparable loss of rights, not against damnum absque injuria." Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv. L. Rev. 525, 549 (1978).

Here, BNE claims that Brown owes money on some guaranteed loans. If BNE prevails at trial or in a summary judgment motion, Brown will be required to pay the judgment. Surely, there is no public interest involved in the final outcome of the cases against Brown. As Professor Leubsdorf asks, if there is no harm to the public interest at the final decision stage, why should harm to the public interest be considered at a preliminary stage?

There are other obvious shortcomings inherent in considering the public interest in an action between a creditor and a borrower as may be seen by the record below. The judge concluded that Brown's interests coincided with those of the public simply because of the magnitude of his real estate holdings. No showing was made, however, that Brown was managing his properties in any way which benefited the public or that others, such as a trustee in bankruptcy, if it reaches that stage, would be incapable of managing those properties as well as, or better than, Brown. We know of no judicial precedent or reason why Brown should be afforded any special protection by a court simply because he has

amassed substantial property interests and correspondingly substantial debt.

Brown claims that some sort of public interest is served if restructuring negotiations continue. Nothing in the record indicates, however, that Brown, in pursuit of his private business interests, has considered any interests of the general public, that Brown was negotiating for the public's general benefit, or that a "restructuring" which Brown would accept would benefit the public in any way. Clearly, the negotiations are designed to be of benefit to Brown, on the one hand, and the financial institutions that lent him the money, on the other. On this record, there is no evidence that the public interest is being served at their bargaining table.

Finally, if we are to allow harm to the public interest to be considered in a dispute between creditor and borrower, the judge's ruling must reflect that such harm be demonstrated by a specific showing and not by broad, sweeping, and vague statements of the borrower. *Continental Group, Inc.* v. *Amoco Chem. Corp.*, 614 F.2d 351, 358 (10th Cir. 1980).

We conclude that the judge used an improper standard — harm to the public interest — in dissolving and vacating the preliminary injunctions previously granted in favor of BNE. We add that we cannot find anything in this record that will otherwise support his actions.[5]

In accordance with our order of March 12, 1991, that portion of the January 4, 1991, order dissolving the injunctions obtained by BNE is reversed, and the injunctions granted on December 21 and December 24, 1990, respectively, are ordered reinstated.

*So ordered.*

---

[5]BNE invites us to rule on other actions of the judge contained in the January 4, 1991, order. We decline the invitation.