Kaplan, Mitchell H., J.
This case is before the court on plaintiff Patriot Energy Group, Inc.’s motion for a preliminary injunction enforcing a “Confidentiality, Non-Competition, Non-Solicitation” agreement (Agreement) that the individual defendants, Brian Kiley and Robert Meehan, signed at or about the time that they commenced work for Patriot. Kiley and Meehan are now both employees of the corporate defendants, Metromedia Energy, Inc., Metromedia Power, Inc., and Energy Express, Inc., who will generally be referred to as Metromedia. For the reasons that follow, Patriot’s motion for a preliminaiy injunction is DENIED.
PROCEDURAL BACKGROUND
Patriot filed this action on November 26, 2013 and obtained an order of notice on their motion for preliminary injunctive relief returnable on December 5, 2013. The defendants moved for a continuance of the hearing date, and it was continued to December 10, 2013, but pursuant to an order that, among other things, prohibited Kiley and Meehan from having contact with any customer that either had dealt with while they were employed by Patriot that was not already a customer of Metromedia. The parties continued the hearing date two additional times, and the motion for preliminary relief was initially heard on January 6, 2014. At the conclusion of that hearing, the court continued the matter to February 5, 2014 to allow the parties to take discovery and expand their submissions in support of and opposition to the motion and to have an opportunity, if they wished, to present testimony or cross examine affiants. The restriction on contact with the individual defendants’ Patriot customers was continued, but with the understanding that this continuance was not to be construed as a finding of likelihood of success on the merits or irreparable injury to any party. At the parties’ request, that hearing was continued to February 12, 2014. On that date, neither party elected to present witnesses, and the case was submitted on the parties’ expanded and somewhat voluminous record and oral argument. The facts that follow are drawn from that record. For the most part, the facts are not substantially in dispute, but rather, the dispute focuses on the inferences and legal conclusions to be drawn from those facts.
FACTS
Patriot is a closely held Massachusetts corporation owned by two individuals, Louis Frate and David Reinfeld. It is an energy broker with an office located *170 in Burlington, Massachusetts. Its business model is to have its clients execute a document which it titles: Appointment of Agent. Under this agency agreement, Patriot’s customer appoints Patriot as its agent -with broad authority to negotiate and enter into contracts on the customer’s behalf with energy suppliers. Almost all of Patriot’s business involves placing customers into contracts with electricity suppliers, but it also occasionally executes contracts on behalf of its clients with natural gas suppliers. Patriot earns its income by adding a commission or fee to the rate at which the energy supplier contracted to provide energy to the customer.
Frate and Reinfeld are also the only two members of Mint Energy, LLC, which operates out of the same suite of offices as Patriot. Mint is an electricity supplier, and some of the energy contracts that Patriot, as agent, executed on behalf of its clients were with Mint. The record contains no evidence that Patriot disclosed the common ownership of Mint and Patriot to all of its customers.
Meehan was first employed by Patriot in August 2010 as an inside sales representative; Kiley was first similarly employed in September 2010.[2] Each signed an essentially identical Agreement at the outset of his employment which, in general terms, prohibited him from (a) disclosing confidential information (broadly defined), and, (b) for a period of one year after termination, working for any company that competes directly or indirectly with Patriot or soliciting any Patriot customer or prospective customer.[3] Prior to joining Patriot, Meehan was a real estate title examiner; his CV suggests that at an earlier time, he worked in recruiting and placing temporary employees and selling industrial carpeting. Riley previously was employed in sales of such products as casters and wheels, computer components, cable and wireless infrastructure and, most recently, mattresses. Neither had any prior experience in the energy industry or selling energy contracts, and there is no evidence in the record that Patriot provided them with any significant training regarding the energy industry. They were each paid a base salary, starting at $26,000 annually and increasing to $35,000, plus commissions on each energy contract that they sold as long as that contract remained in place, but subject to reduction if they failed to meet their sales quota in any month. For example, if either was at 75% of his quota for a month, he would receive 75% of the commissions he otherwise would be due.
As inside sales representatives, their primary job was to make cold calls to prospective customers. They were required to be at work from 9:00 AM to 5:30 PM and required to be on the telephone from 9:00 AM to 11:00 AM and then from 1:00 PM to 4:00 PM each day. The balance of the day was for e-mailing and administrative work. Patriot provided them with some lists of prospective customers that were published by state utility departments and available to any licensed energy broker, and they developed their own leads from Google or publicly available databases. Patriot did not provide them with any proprietary or confidential lists of prospective clients. If their prospecting struck gold, their role was to inquire about the customer’s energy needs and get them to sign the agency agreement.
A Patriot processing department then provided quotes for potential energy contracts with energy suppliers, usually three for each prospective customer. These contracts could be fixed rates for periods of one or more years, or monthly contracts at variable rates. The quotes would be at a price per unit of energy and did not break out the commission or margin built into those rates that would be paid to Patriot.
The sales representative would communicate the quotes to the customer, but would not necessarily know the profit margin that the processing department had built into the rates and would have no authority to vary the quotes. The sales representative generally was the only person to speak to the customer, but had no contact with the energy supplier. At times, if the customer was large enough to warrant it, Patriot would assign a relationship manager to the customer who might call on the customer directly.
Meehan and Kiley, as inside sales representatives, communicated with customers only by telephone or e-mail and never left Patriot’s offices. Their communications with the customer generally ended once a contract was executed, until the contract was close to expiration and it was time to attempt to have the customer sign a new contract. With customers on variable monthly contracts, this contact might be more frequent than with customers on long-term contracts. The record is not clear as to the percentage of Meehan’s or Kiley’s customers that were on long-term contracts as opposed to monthly contracts, but the few commission reports (described below) in the record suggest that the vast majority of their customers were on year-long contracts.
Each month, Meehan and Kiley had a so-called “commission report” sent to their homes. These reports listed each customer that a sales representative had “signed up,” the type of energy contract executed on its behalf, when the contract would expire, the customer’s average monthly energy consumption, and the commission the sales representative received for each contract. The commission reports did not identify the customer contact person, the rate per unit of energy, or the profit margin built into that rate. These commission reports were not marked secret or confidential and did not appear to have any legend on them telling the sales representatives what to do with them after they received them in the mail.
In February 2012, Frate asked Kiley to join a special “elite” sales group, which would be “an independently sufficient entity within the organization.” He was required to sign a “Special Project and Secrecy Agree *171 ment” to participate, which did not contain non-solicitation or non-compete clauses. This elite group was called “Team Eight” and was revealed to be a group of eight Patriot sales representatives who were chosen to cold call potential customers on behalf of Mint and convince them to enter into energy supply contracts with Mint directly rather than through an agency relationship with Patriot. The eight sales representatives worked in a separate room •within the Patriot office space that was locked and to which only they were given keys. They were each told to adopt a fictitious name and given e-mail and voicemail addresses identifying them as employees of Mint with these fictitious names. They were also provided with Mint business cards using the fictitious names and told that they could call on potential customers.[4] They were provided with special parking spaces, food, beer, and an area in their work room where they could watch television. The strict rules that regulated when Patriot sales representatives had to be on the telephone and could eat their lunch did not apply to them. Each of the sales representatives continued to be paid by Patriot while they worked for Mint, and for purposes of their commission income, treated as if they sold 100% of their assigned monthly quotas. They were also told that they would “receive additional rewards for [their] contributions.” The additional rewards or bonuses were never defined and ultimately never awarded.
Kiley and Patriot dispute whether Team Eight members were told to “poach” Patriot customers. Obviously, moving a Patriot customer to a contract directly with Mint would deprive a Patriot sales representative of the commission he/she would receive on that sale. Mint only sold variable monthly contracts, so the Mint contract would not be of interest to Patriot customers who wanted fixed rate energy contracts for a year or longer; however, other energy suppliers, such as ConEd, also offered monthly contracts. While the record reflects at least one instance in which a Patriot customer, who clearly did not understand the relationship between Patriot and Mint, complained to the Patriot sales representative, who happened to also be a Team Eight member, of being pressured by a Mint salesperson, the record does not establish that there was active poaching. While this might be revealed with additional discovery and proved at trial, it appears more likely that with constant cold calling and no inclusive Patriot customer lists available to Team Eight members, there would inevitably be some calls made to Patriot customers, although it is certainly possible that Team Eight members identified Patriot customers on monthly contracts and contacted them on behalf of Mint.
In any event, in June 2012, Team Eight was disbanded, and Kiley returned to his job as a Patriot sales representative. Kiley never received an additional reward for his Team Eight contribution. In fact, although Kiley was paid his Patriot compensation for the four months that he was a member of Team Eight as if he had achieved his Patriot sales quota each month, he received no commissions for his work on behalf of Mint and therefore lost the additional commissions that he would have earned on the placement of energy contracts with new Patriot customers during these four months and during all subsequent months when these contracts would still be in force.[5]
Patriot involuntarily terminated Kiley on December 5, 2012. Patriot contends that he was fired for making a sexually offensive remark, making a disparaging remark about his direct supervisor, and sending an e-mail to his long-term girlfriend with whom he lived that disclosed that Patriot had an annual turnover rate of 78% in its workforce. According to Patriot, these reasons for termination were discussed with Kiley during an exit interview. Kiley’s personnel file only reflects an involuntary termination without the reasons for it. While Kiley admits making a sexually suggestive joke and a comment about his superior, he contends that others made the same comment. Kiley asserts that he had been complaining to Patriot’s finance department for some period prior to his termination that he was owed several thousand dollars in commissions that he had not been paid. Based on affidavits and the deposition excerpts in the record before the court, the court is unable to assess witness credibility and can make no finding as to the reason for Kiley’s termination; indeed, it may have been for a combination of the reasons proffered by each party.
Kiley began work at Metromedia on January 3, 2013. The Metromedia companies act as a broker of electric energy contracts and a supplier of natural gas. Kiley prospects for customers much as he did at Patriot by making cold calls, although at Metromedia, he is also permitted to call on customers in person. He develops his leads himself, much as he did at Patriot, and is also provided with lists of customers from public utility agencies in those states that provide electricity brokers with that type of information. With respect to electric supplier contracts, unlike Patriot, Metromedia does not act as agent for its customers, but rather as the broker for the electricity suppliers. Generally, the supplier tells its brokers the maximum fee or profit margin that can be added to. the rate per unit of energy quoted by the supplier, and Metromedia gives sales representatives, such as Kiley, some discretion to reduce the fee or profit margin in order to make a sale. Kiley thus deals with both suppliers and potential customers. At Metromedia, Kiley receives a base salary of $45,000 plus commission on sales of electricity and natural gas.
While working for Metromedia, Kiley contacted customers that he successfully placed in energy contracts while he was employed by Patriot. Kiley contacted 38 such customers and was able to sell energy to 21 of them. Some of those customers were placed *172 in natural gas contracts, while Patriot had done business for them only on electricity contracts. Of the 21 customers who purchased energy through Metromedia, the record is not clear as to how many of these customers have electricity contracts and how many have natural gas contracts. The record does not reveal the income lost by Patriot on the electricity contracts.
Meehan had no involvement with Team Eight. He voluntarily terminated his employment with Patriot in January 2013. Like Kiley, Meehan believed that Patriot was not paying him all the commissions he was due. The record is insufficient to determine if this belief was justified, or, if so, what he was due. He began working at Metromedia in a position similar to that of Kiley on February 5, 2013, although his base salary is $50,000.
Meehan similarly contacted customers to whom he successfully sold electricity contracts while employed at Patriot. His initial approach was to attempt to interest them in a natural gas contract with Metromedia, but he also discussed electricity contracts with all prospective customers. Meehan contacted 18 former Patriot customers and entered into contracts with 8. Again, it is not clear how many of those 8 contracts are for natural gas and how many are for electricity, or how much annual income Patriot lost with respect to those contracts.
The record does not reflect when or how Patriot first learned that Meehan and Kiley were working as sales representatives for Metromedia. On May 31, 2013, counsel for Patriot sent Meehan and Kiley a letter asserting that they were violating the terms of their Agreements with Patriot. That was followed by letters to Metromedia dated June 14, 2013 and June 28, 2013. The latter letter stated that: “Patriot will have no choice but to file a lawsuit against Metromedia in Superior Court on July 19,2013.’’This action was filed on November 26, 2013. At oral argument, Patriot’s counsel suggested that Patriot delayed in filing this action because of ongoing discussions with counsel for Metromedia, but there is nothing in the record that reflects any acknowledgment by Metromedia that Meehan and Kiley were violating enforceable provisions of the Agreements or that Metromedia would discharge them or otherwise prohibit them from contacting customers with whom they dealt while employed by Patriot for the purpose of attempting to sell them electricity contracts brokered by Metromedia or gas contracts supplied by Metromedia.
DISCUSSION
To prevail on its request for a preliminary injunction, Patriot must show a strong likelihood of success on the merits of its claims, that it will suffer irreparable harm without the requested injunctive relief, and that its harm, without the injunction, outweighs any harm to Kiley or Meehan from being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993). See also Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). A preliminary injunction is a significant remedy that should not be granted unless the plaintiff has made a clear showing of entitlement thereto. Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004).
The standards to be applied in determining whether to enforce restrictive covenants in employment agreements have been well established in Massachusetts for some time.
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, supra at 716. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with his customers. See All Stainless, Inc. v. Colby, supra at 779-80. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros. Inc. v. Westinghouse Bdcst. Co. Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974). See Boulanger v. Dunkin’ Donuts Inc., 442 Mass. 635, 639 (2004) (recognizing that covenants not to compete are valid if they are reasonable in light of facts in each case). A non-competition covenant must also be reasonable in geographic and temporal scope. See, e.g., All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974). Of course, every case in which a previous employer of a defendant seeks to enforce restrictive covenants will turn on the sometimes difficult application of these standards to the facts presented by the case then at bar.
Patriot moves pursuant to Mass.R.Civ.P. 65 for a preliminary injunction: (1) enjoining Kiley and Meehan from working for the corporate defendants and otherwise violating the non-compete provisions of their confidentiality agreements; (2) enjoining all defendants and those acting in concert with them from soliciting Patriot’s customers; (3) enjoining Kiley and Meehan from disclosing to the corporate defendants and to any other person or entity the confidential information they acquired from their employment with Patriot and from “using, copying, concealing, selling transferring, disseminating, transmitting, posting, or otherwise disclosing, for any purpose and by any means, any of Plaintiffs Confidential information”; (4) enjoining the corporate defendants from “possessing, receiving, obtaining, using, copying, disclosing, concealing, selling, transferring, disseminating, transmitting, posting, or otherwise disclosing, for any purpose and by any means, Plaintiffs Confidential Information, including, without limitation, Plaintiffs customer names, customer contact information, pricing information, customer consumption of electricity or natu *173 ral gas, and customer purchasing information”; and (5) ordering Kiley and Meehan to return to Patriot all confidential information they acquired by reason of their employment with Patriot, including all client lists and client information (whether in hard copy or electronic format). The defendants oppose Patriot’s motion for a preliminary injunction on a number of grounds.
Agreement with Respect to Kiley
A non-solicitation agreement or covenant not to compete may be deemed void if there are material changes in the employment relationship between an employee and the employer. See, e.g., Iron Mountain Information Mgmt., Inc. v. Taddeo, 455 F.Sup.2d 124, 132 (E.D.N.Y. 2006); AFC Cablesystems Inc. v. Clisham, 62 F.Sup.2d 167, 172-73 (D.Mass. 1999); Akibia, Inc. v. Hood, 31 Mass. L. Rptr. 489, 2012 WL 10094508 (Mass.Super.Ct. Oct. 9, 2012) (Locke, J.); Grace Hunt IT Solutions, LLC v. SIS Software, LLC, 29 Mass. L. Rptr. 460, 2012 WL 1088825 (Mass.Super.Ct. Feb. 14, 2012) (Lauriat, J.); Lycos, Inc. v. Jackson, 18 Mass. L. Rptr. 256, 2004WL2341335 (Mass.Super.Ct. Aug. 25, 2004) (Houston, J.). Far reaching changes in an employment relationship, such as changes in the rate of compensation or sales area, suggest that the parties have abandoned their old arrangement and entered into a new employment relationship. F.A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585, 587 (1968). Accordingly, each time an employee’s employment relationship with the employer changes materially such that the parties have entered into a new employment relationship, the parties must execute a new non-solicitation agreement or covenant not to compete. Iron Mountain Information Mgmt, Inc. v. Taddeo, 455 F.Sup.2d at 132-33 (citation omitted).
Kiley argues that the Agreement he signed on September 13, 2010 became unenforceable because his position changed materially, and he was not asked to sign a new non-compete agreement. The court agrees with Kiley. Although, as noted above, neither Kiley’s nor Meehan’s position changed materially when each was promoted to the position of senior inside sales representative, Kiley’s position did change materially when he was tapped to perform work for Team Eight in March of 2012. As a member of Team Eight, Kiley’s job was to cold call potential customers on behalf of Mint, which, as Patriot itself points out, is a separate legal entity from Patriot. He was no longer asking customers to allow Patriot to be their agent in finding supplier contracts for them, but rather, soliciting them to enter into energy supply contracts directly with Mint. He worked in a separate room within the Patriot office space that was locked, and he was told to adopt a fictitious name and given e-mail and voicemail access identifying him as an employee of Mint with a fictitious name.[6] Frate provided Kiley with Mint business cards using his fictitious name. Kiley continued to be paid by Patriot while he worked for Mint, and for compensation purposes, treated as if he sold 100% of his assigned monthly sales quota, but he was not working for commissions. He received no commissions when he sold a Mint contract to a new customer. Kiley returned to his former position at Patriot in July of 2012 when he stopped working for Team Eight, but he added no customers to his commission base for the four months that he sold supply contracts for Mint. If he lost customers because their contracts expired without contact from him while he was working for Mint, those commission dollars would be lost in the future as well. In the end, he received no additional compensation on account of his work for Team Eight to make up for these losses.
In consequence, the restrictive provisions of Kiley’s Agreement with Patriot were no longer in effect after he was assigned to Team Eight beginning in March of 2012. While the court recognizes that Kiley returned to his former position with Patriot after he left Team Eight in July of 2012, and ultimately left the company as a senior inside sales representative on December 5, 2012 after Patriot terminated him, this does not change the fact that Kiley’s employment relationship with Patriot changed materially from March to July of 2012. Although Massachusetts appellate court decisions do not provide guidance, under the unique facts of this case in which there was a material change in employment for a period and then the defendant returned to his old job, the court concludes that the doctrine should be applied to Kiley, particularly where his commission income was permanently impacted by his work for Mint, and therefore, the restrictive covenants in his Agreement with Patriot are unenforceable.[7]
Covenant Not to Compete
Meehan’s Agreement with Patriot contains a section on “Prohibited Competition and Solicitation.” Section IV(c) of the Agreement states:
During the period in which Employee performs services for or at the request of PEG [Patriot Energy Group, Inc.) and for one year following the termination of his/her provision of services to PEG for any reason or for no reason, Employee will not, without the prior written consent of PEG, engage in the following activities either through or on behalf of his/her self, a third party or another person/entity, whether directly or indirectly:
1. either as principal, partner, stockholder, officer, director, member, employee consultant, agent, representative or in any other capacity, own, manage, operate or control, or be concerned, connected or employed by, or otherwise associate in any manner with, engage in, or have a financial interest in, any business which is directly or indirectly Competing with the business of PEG within the Restricted Territory, provided that: (A) nothing contained herein will preclude Employee from purchasing or owning securities of any such business if such securities are publicly traded and his/her holdings do not exceed one percent (1%) of the issued and outstanding securities of any class of securities of *174 such business, and (B) nothing contained herein will prevent Employee from being employed by a subsidiary, division or affiliate or unit (each, a “Unit”) of an entity if that Unit is not engaged in any business which is Competing with the business of PEG, irrespective of whether some other Unit of such entity engages in such competition;
2. solicit, divert or appropriate, or attempt to solicit, divert or appropriate, for the purpose of Competing with PEG within the Restricted Territory, any Customers or Prospective Customers of PEG, with respect to which PEG has developed or made a sales presentation (or similar offering of services);
3. (i) solicit, entice or persuade, or attempt to solicit, entice or persuade, any other employees or consultants to PEG to leave the services of PEG or any such parent, subsidiary or affiliate for any reason, or (ii) employ, cause to be employed, or solicit the employment of any employee of or consultant to PEG while any such person is providing services to PEG or within six months after any such person ceases providing services to PEG;
4. interfere with, or attempt to interfere with, the relations between PEG and any vendor or supplier to PEG; or
5. sell or market or assist any other person in selling or marketing any product or service that competes, directly or indirectly, with any product or service manufactured, sold or under development by PEG at the same time the Employee’s employment with PEG is terminated.
A restrictive covenant may be used to protect a business’s legitimate interest in its goodwill. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977). As noted above, however, a restrictive covenant that protects an employer from ordinary competition does not serve a legitimate business interest. Marine Contractors Co. v. Hurley, 365 Mass. at 287-88. Goodwill has been defined as a company’s positive reputation in the eyes of its customers or potential customers and is generated by repeat business with existing customers, or by referrals to potential customers. North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 869-70 (2009). In order for an individual to infringe on the former employer’s goodwill, that individual “must be in a position where he can harm that good will, perhaps . . . because of his knowledge of some business secret or confidential information ... or perhaps . . . because the former employee’s close association with the employer’s customers may cause those customers to associate the former employee, and not the employer, with products of the 1ype sold to the customer through the efforts of the former employee.” All Stainless, Inc. v. Colby, 364 Mass. at 779-80.
On the record before it, the court concludes that further enforcement of the “Prohibited Competition and Solicitation” section of the Agreement is not warranted. As to Meehan, Patriot has not yet demonstrated that this restrictive covenant should be enforced to protect a legitimate interest in its goodwill because Meehan was in no position to take Patriot’s goodwill with him to Metromedia. See Cypress Group, Inc. v. Stride & Associates, Inc., 17 Mass. L. Rptr. 436, 2004 WL 616302 at *3 (Mass.Super.Ct. Feb. 11, 2004) (Burnes, J.) (determining that recruiters who made 150 to 200 cold calls per day did not develop or maintain continuing relations with customers that would allow them to infringe on employer’s goodwill). As discussed above, Meehan’s relationship and communications with the customers he generated was sporadic at best. As an inside sales representative, he communicated only by telephone or e-mail with customers and never left Patriot’s offices. His communications with the customer generally ended once a contract was executed after a successful cold call, until the contract was close to expiration and it was time to try to have the customer sign a new contract. The commission reports contained in the record suggest that most of Meehan’s customers were on yearlong contracts, which would mean that he usually did not frequently communicate with the customers he generated. Meehan’s situation may be contrasted with cases in which the employer encourages the sales representative to develop close relationships with his customer base, for example, by reimbursing entertainment expenses and encouraging sight visits. Here, Meehan was required to make literally hundreds of cold calls a week. The emphasis was on brief contacts and volume. Indeed, the record suggests that if an inside sales representative landed a potentially large customer, someone else was assigned to be the relationship manager for that customer.
Moreover, there is no evidence before the court that indicates that Patriot provided Meehan with any specialized training in the energy industry or Patriot’s business model that would have allowed him to develop close and specialized relationships with Patriot’s customers. Based on these facts, Meehan was simply not in a position to substantially harm Patriot’s goodwill when he left for Metromedia.[8]
Disclosure of Confidential Information
Section III of the Agreement addresses confidential information. The Agreement defines confidential information as “trade secrets and confidential and proprietary information of PEG . . .” including, but not limited to information about past, current, or prospective clients; the identity of products purchased by Patriot’s customers; supplier identities and characteristics; and information about Patriot’s “back office systems.” Moreover, the Agreement provides that; “Employee will at all times, both during the period he/she is performing services for PEG and after termination of such services for any reason or for no reason, maintain in confidence and will not, without prior written consent of PEG, use (except in the course *175 of performance of his/her duties for PEG by court order), disclose, or give others any Confidential Information.” Upon Meehan’s termination, he was required to return all confidential information to Patriot.
In cases involving trade secrets, the crucial issue for the court to determine is whether the information sought to be protected is confidential, in fact and in law: Jet Spray Cooler, Inc. v. Crompton, 361 Mass. 835, 840 (1972). While “no general and invariable rule can be laid down,” courts may evaluate the following six factors to determine if information is a trade secret:
(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
Id. (citation omitted). In addition, a plaintiff is required to take proper and reasonable steps to preserve the secrecy of a trade secret — the court’s inquiry depends on the circumstances of each case and looks to “the nature of the information sought to be protected as well as the conduct of the parties.” USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 101 (1979).
In this case, Patriot has not demonstrated, thus far, that it gave Meehan significant confidential information that entitles it to preliminary injunctive relief. The customer lists that Patriot gave to Meehan and other inside sales representatives were not confidential. These lists were provided by state utilities to Patriot and other competing licensed energy brokers. Inside sales representatives updated the lists and developed their own leads through internet searches or publicly available databases, but this type of lead generating effort was engaged in by competing energy brokerage companies, like Metromedia.
The commission reports, which Patriot actually mailed to the homes of inside sales representatives each month, also do not appear to contain significant trade secrets.[9] Indeed, if they did, it is unlikely that they would be mailed to sales representatives at their homes. As discussed above, the commission reports listed each customer that a sales representative had “signed up,” the type of energy contract executed on its behalf, when the contract would expire, the customer’s average monthly energy consumption, and the commission the sales representative received for each contract. The commission reports did not identify the customer contact person, the rate per unit of energy, or the profit margin built into that rate.[10] The commission reports were not marked secret or confidential and did not tell the sales representatives what to do with them. While knowledge of when a contract with a third-party supplier was due to expire was certainly useful information, Patriot has not proven that the customer lists, commission reports, or any other documents to which Meehan had access were trade secrets or confidential. Based on the circumstances of this case and the conduct of the parties, the court concludes that preliminary injunctive relief related to the confidential information provision contained in Patriot’s Agreement with Meehan is not required.
Timing
The defendants argue that Patriot’s delay in filing this action and requesting preliminary injunctive relief further militates against granting an injunction. See Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 494-95 (1986) (“Unexplained delay in seeking relief for allegedly wrongful conduct may indicate an absence of irreparable harm and may make an injunction based upon that conduct inappropriate”). Kiley was fired from Patriot in December of 2012, and Meehan ended his employment at Patriot in January of 2013. The record does not reflect when or how Patriot first learned that Meehan and Kiley were working as sales representatives for Metromedia. However, the record indicates that Patriot knew about their employment at Metromedia as early as May of 2013. Patriot filed its request for a preliminary injunction on November 26, 2013. At the hearing on February 12, 2014, Patriot argued that at least some of the delay was attributable to mutual efforts with in-house counsel for Metromedia to resolve the issue short of litigation, and it should not be estopped from seeking preliminary injunctive relief by reason of delay occasioned by these efforts at a consensual resolution.
Although the court will always encourage settlement efforts and never penalize a party for delaying action while such efforts are ongoing, in this case, as noted above, there is nothing in the record that suggests that Metromedia was willing to constrain Kiley and Meehan in their work to accommodate Patriot’s concerns. In consequence, several months passed from the date that Patriot learned that its former sales representatives were working for a competitor and the date it asked for preliminary injunctive relief. Presumably, if Patriot was concerned that it was suffering significant, irreparable harm during this period, it would have acted to protect its interests. The lengthy delay in filing this action is a factor to be considered in determining whether preliminary injunctive relief is necessary to protect Patriot from suffering irreparable injury. On the record before the court, Patriot has not shown that it will suffer irreparable harm without the requested preliminary injunctive relief such that it cannot be made whole by a judgment for monetary damages, an adequate remedy at law, if it is successful at trial. Meehan and Kiley have been restrained from contacting Patriot customers for three months. More than a year has passed since each of them left Patriot, and, as most of their customers appear to have been on annual contracts, those contracts have long since *176 been renewed by Patriot or expired and the customers moved on to other brokers or suppliers.
Competition
As noted above, “protection of the employer from ordinary competition ... is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced.” Richmond Bros. Inc. v. Westinghouse Bdcst Co. Inc., 357 Mass. at 111. On the record before the court, there is no indication that either Kiley or Meehan had received specialized training from Patriot or knowledge of the industry such that they were bringing to Patriot’s customers, a special Patriot service with unique benefits. Patriot appears to be an electric energy broker that works as an agent to sell a fungible product — electric energy. It is, in effect, a portal through which businesses can purchase electric energy in those states in which deregulation has occurred. Restrictive contracts that may prevent businesses from learning about opportunities to purchase units of electric energy — the very same energy unaccompanied by other benefits provided by the broker — for less money, do not appear to be in the public interest or to protect legitimate business interests. See Bank of New England, N.A. v. Mortgage Corp. of New England, 30 Mass.App.Ct. 238, 246 (1991) (noting that “public interest may also be considered in a case between private parties where the applicable substantive law involves issues that concern public interest”); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-03 (1979) (recognizing that obstruction of public interest may be bar to enforcement of restrictive covenant).
ORDER
For the foregoing reasons, Patriot Energy Group, Inc.’s motion for preliminary injunction is DENIED. The interim order on the plaintiffs motion for preliminary injunctive relief dated January 6, 2014 is VACATED.

Meehan and Kiley both attest that they were hired as junior sales representatives and some time later promoted to senior sales representatives, with a different compensation structure. Neither defendant provides any explanation regarding the difference in compensation or suggests any material changes in their jobs following this “promotion.” The court finds, on the record before it, that for the purposes of this motion, the junior/senior designation is not material.

he Agreements contain a choice of law provision that specifies that the Agreements shall be governed by Massachusetts law.

Patriot asserts that the fictitious names were to avoid confusion. It is not apparent what the confusion would be. Unless a Team Eight member was calling his/her own Patriot customers, why would the use of one’s real name cause confusion? Moreover, Patriot was the agent for its customers in placing and executing energy agreements. It would seem that if Patriot was recommending a Mint contract to its customers, it would have a fiduciary duty to disclose the relationship between Patriot and Mint. Unless Patriot/Mint were concerned about customers and potential customers inadvertently learning about the relationship between Patriot and Mint, there appears to be no reason for this elaborate plan and direction to use fictitious names.

The Kiley commission reports in the record suggest nearly all of Kiley’s customers were on contracts of a year or more, not monthly.

Various Massachusetts regulations prohibit licensed energy brokers from making any material misrepresentations to the public or to any consumer. See 940 Code Mass. Regs. §19.04 (“It is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement, or through the use of any misleading symbol or representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of deceiving or misleading a reasonable consumer, in any material respect . . .”); 940 Code Mass. Regs. §19.05 (“It is an unfair or deceptive act or practice for a retail seller of electricity to fail to disclose material information about its products, services, or business, where such failure has the capacity or tendency to deceive or mislead a reasonable consumer, or has the effect of deceiving or misleading such a consumer, in any material respect... It is an unfair or deceptive act or practice for a retail seller of electricity to fail to disclose to a consumer any material fact the disclosure of which may have influenced a reasonable consumer not to enter into a transaction”). To rule on the pending motion, the court need not decide whether Patriot violated these regulations by ordering Team Eight members to adopt fictitious identities and giving them the e-mail, voicemail, and business cards necessary to carry out the ruse. This conduct is not directly related to the issues raised by the motion. See Amerada Hess Corp. v. Garabedian, 416 Mass. 149, 156 (1993) (noting that “[i]n order to deny relief to a party because of inequitable conduct, the conduct at issue must directly affect the claim being brought”). However, when Patriot required Kiley to do these things, it was certainly changing the terms of his employment.

Even if the material change doctrine did not make the restrictive provisions of Kiley’s Agreement with Patriot unenforceable, for the reasons discussed below related to Meehan’s Agreement with Patriot, which is virtually identical to the Agreement Kiley signed, preliminary injunctive relief is still not warranted with respect to Kiley.

In fact, Meehan contacted only 18 customers in the eleven-month period from the time he started work for Metromedia to the date the temporary order entered and succeeded in signing up only eight. And as to those eight, it is not known how many are in natural gas supply contracts not electricity. This seems like a very small number when one considers that Meehan is making hundreds of solicitation calls each week.

The fact that the commission reports were mailed to the personal residences of inside sales representatives is significant because it demonstrates that Patriot did not view the information contained in the reports as so confidential that it could not send the reports to the residences of employees where they could be readily viewed by or shared with anyone.

Patriot points to e-mail exchanges between Meehan and Kiley and potential Metromedia customers in which the two salesmen contend that they can beat Patriot’s prices. Patriot suggests that this demonstrates that the sales representatives must have had confidential Patriot information concerning these customers in hand when they made these contacts. However, neither the supplier’s rates nor Patriot’s profitmargins are listed on the commission reports. Both Meehan and Kiley testified, and there is at this point, no evidence to the contrary, that when a prospect was willing to engage with them, the first thing they would do was to ask the customer for a copy of its most recent energy bill, which would contain that information.